IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| DOUGLAS A. BROWN | § | CASE NO. 07-36422-H1-7 |
| JULIET HOMES, L.P. | § | CASE NO. 07-36424-HI-7 |
| JULIET GP, L.L.C. | § | CASE NO. 07-36426-HI-7 |
| | § | |
| **Debtors** | § | |
| | § | |
| JOSEPH M. HILL, TRUSTEE | § | |
| AND W. STEVE SMITH, TRUSTEE, | § | |
| | § | |
| **PLAINTIFFS** | § | |
| | § | |
| v. | § | |
| | § | |
| ALEX ORIA, BERNIE KANE, BINH HO, | § | ADVERSARY NO. 09-3429 |
| BOB SHIRING, BROYD INC. DBA FIRST | § | |
| TEXAS RESIDENTIAL, C&B | § | |
| INVESTMENTS INC., CAROLINE | § | |
| BROWN DBA SORELLA GROUP, | § | |
| CONNIE BROWN, DAMAZO VIDAL, | § | |
| DAVID GREENBERG, DON SANDERS, | § | |
| DON WEIR, ERICA ZEMAITIS BROWN, | § | |
| FRANK POWELL, GGG HOLDINGS, LP, | § | |
| GREENBERG & CO., HUE HO, JAMES | § | |
| COUNCE, JAMES THOMAS, JULIAN | § | |
| FERTITTA, MALLADI REDDY, | § | |
| MARQUIS CAPITAL II WESTCOTT, LP | § | |
| DBA MARQUIS CAPITAL, MARQUIS | § | |
| CAPITAL II, LLC, MELISSA THOMAS, | § | |
| MICHAEL ECKLUND, MIR AZIZI, | § | |
| MUDUGANTI J. REDDY, NADENNE | § | |
| CALDERON, NAJMUDDIN KARIMJEE, | § | |
| PINNACLE TITLE COMPANY, LP, | § | |
| PIRTLE INVESTMENTS, LP, RAJ | § | |
| RANGWANI, RAVI REDDY, RAY | § | |
| LINDGREN, RICHARD ROBERT, | § | |
| ROBERT ODOM, SAIFI, LLC, SANDERS | § | |
| 1998 CHILDREN'S TRUST, SANDERS | § | |
| OPPORTUNITY FUND, LP, SANJAY | § | |
| VARMA, SHAWN GOHEEN, | § | |
| SHREYASKUMAR PATEL, STEVE | § | |

ITTNER, TERRY LUTTRELL, THAI          §
NGUYEN, THEYEN HOANG, THOMAS          §
BOYD, TMCM VENTURES, LP, TODD         §
STONER, TOM PIRTLE, TULLIS            §
THOMAS, VINCENT GALEOTO,              §
WARREN G. KING, WASHINGTON HO,        §
WILLIAM MARSH RESCO I, LP.            §
                                      §
    DEFENDANTS.                       §

## TRUSTEES' SECOND AMENDED COMPLAINT

TO THE HONORABLE MARVIN ISGUR, CHIEF U.S. BANKRUPTCY JUDGE:

COMES NOW, Joseph M. Hill ("Hill"), Chapter 7 Trustee of the estates of Juliet Homes, LP and Juliet GP, LLC and W. Steve Smith ("Smith"), Chapter 7 Trustee of the estate of Douglas Allen Brown (hereinafter together referred to as "Trustees" or "Plaintiffs") and file their Second Amended Complaint ("Complaint").[1]

## I. PARTIES AND SERVICE

1.      Hill is the duly appointed Chapter 7 Trustee for the estates of Juliet Homes, LP and Juliet GP, LLC (collectively "Juliet").

2.      Smith is the duly appointed Chapter 7 Trustee for the estate of Douglas Allen Brown ("Brown").

3.      Hill has causes of action which include the necessity of reverse piercing through Brown, and Smith has causes of action which include the necessity of piercing through Juliet. Some causes of action may be direct and/or jointly owned.

4.      To overcome the necessity of piercing and the related expense, Hill and Smith have joined forces and pursue the causes of action jointly as if piercing had occurred.  As a result, this adversary proceeding is brought by Trustees jointly not only in the name of Brown

---

[1] All docket numbers in this brief refer to documents filed in Adversary No. 09-3429.

and the Juliet estates, but also in the name of the entities owned and controlled by one or more such estates.

5.     Defendant Alex Oria is an individual residing in Harris County, Texas.  Alex Oria has appeared.

6.     Defendant Bernie Kane is an individual residing in Harris County, Texas.  Bernie Kane has been served with process via first class United States mail, postage fully pre-paid, as identified in the Certificate of Service filed with the Court at Doc. 82, but has not yet appeared.

7.     Defendant Binh Ho is an individual residing in Harris County, Texas.  Binh Ho has been served with process via first class United States mail, postage fully pre-paid, as identified in the Certificate of Service filed with the Court at Doc. 82, but has not yet appeared.

8.     Defendant Bob Shiring is an individual residing in Harris County, Texas.  Bob Shiring has appeared.

9.     Defendant Broyd Inc. dba First Texas Residential is a Texas corporation.  Broyd Inc. d/b/a First Texas Residential has been served with process via first class United States mail, postage fully pre-paid, as identified in the Certificate of Service filed with the Court at Doc. 82, but has not yet appeared.

10.     Defendant C&B Investments, Inc is a Texas corporation. It may be served with process by serving its registered agent at 930-N South Mason Road, Katy, Texas 77450.

11.     Defendant Caroline Brown dba Sorella Group is an individual residing in Harris County, Texas.  Caroline Brown has been served with process via first class United States mail, postage fully pre-paid, as identified in the Certificate of Service filed with the Court at Doc. 82, but has not yet appeared.

12.     Defendant Connie Brown is an individual residing in Montgomery County, Texas.

Connie Brown has been served with process via first class United States mail, postage fully pre-paid, as identified in the Certificate of Service filed with the Court at Doc. 82, but has not yet appeared.

13.     Defendant Damazo Vidal is an individual residing in Montgomery County, Texas. Damazo Vidal has appeared.

14.     Defendant David Greenberg is an individual residing in Harris County, Texas. David Greenberg has appeared.

15.     Defendant Don Sanders is an individual residing in Harris County, Texas. Don Sanders has appeared.

16.     Defendant Don Weir is an individual residing in Harris County, Texas. Don Weir has been served with process via first class United States mail, postage fully pre-paid, as identified in the Certificate of Service filed with the Court at Doc. 82, but has not yet appeared.

17.     Defendant Erica Zemaitis Brown is an individual residing in Broward County, Florida. Erica Zemaitis Brown has been served with process via first class United States mail, postage fully pre-paid, as identified in the Certificate of Service filed with the Court at Doc. 82, but has not yet appeared.

18.     Defendant Frank Powell is an individual residing in Montgomery County, Texas. has been served with process via first class United States mail, postage fully pre-paid, as identified in the Certificate of Service filed with the Court at Doc. 82, but has not yet appeared.

19.     Defendant GGG Holdings, LP is a Texas limited partnership. has been served with process via first class United States mail, postage fully pre-paid, as identified in the Certificate of Service filed with the Court at Doc. 82, but has not yet appeared.

20.     Defendant Greenberg & Co. is a Texas corporation. Greenberg & Co. has

appeared.

21.     Defendant Hue Ho is an individual residing in Harris County, Texas.  Hue Ho has been served with process via first class United States mail, postage fully pre-paid, as identified in the Certificate of Service filed with the Court at Doc. 82, but has not yet appeared.

22.     Defendant James Counce is an individual residing in Harris County, Texas and can be served at 2116 Chilton Road, Houston, Texas 77019.

23.     Defendant James Thomas is an individual residing in Harris County, Texas. James Thomas has appeared.

24.     Defendant Julian Fertitta is an individual residing in Harris County, Texas.  Julian Fertitta has appeared.

25.     Defendant Malladi Reddy is an individual residing in Harris County, Texas. Malladi Reddy has appeared.

26.     Defendant Marquis Capital II Westcott, LP dba Marquis Capital is a Texas limited partnership. It can be served by serving process on its registered agent, Michael Eckland, 12002 Bellavista Ct, Houston, Texas 77041.

27.     Defendant Marquis Capital II, LLC is a Texas limited liability company. It can be served by serving process on its registered agent, Michael Eckland, 12002 Bellavista Ct, Houston, Texas 77041.

28.     Defendant Melissa Thomas is an individual residing in Harris County, Texas. Melissa Thomas has been served with process via first class United States mail, postage fully pre-paid, as identified in the Certificate of Service filed with the Court at Doc. 82, but has not yet appeared.

29.      Defendant Michael Ecklund is an individual residing in Harris County, Texas.

Michael Ecklund has appeared.

30.     Defendant Mir Azizi is an individual residing in Harris County, Texas.  Mir Azizi has been served with process via first class United States mail, postage fully pre-paid, as identified in the Certificate of Service filed with the Court at Doc. 82, but has not yet appeared.

31.     Defendant Muduganti J. Reddy is an individual residing in Harris County, Texas. Muduganti J. Reddy has appeared.

32.     Defendant Nadenne Calderon is an individual residing in Fort Bend County, Texas.  Nadene Calderon has been served with process via first class United States mail, postage fully pre-paid, as identified in the Certificate of Service filed with the Court at Doc. 82, but has not yet appeared.

33.     Defendant Najmuddin Karimjee is an individual residing in Harris County, Texas. Najmuddin Karimjee has been served with process via first class United States mail, postage fully pre-paid, as identified in the Certificate of Service filed with the Court at Doc. 82, but has not yet appeared.

34.     Defendant Pinnacle Title Company, LP is a Texas limited partnership.  Pinnacle Title Company, LP has appeared.

35.     Defendant Pirtle Investments, LP is a Texas limited partnership.   Pirtle Investments, LP has appeared.

36.     Defendant Raj Rangwani is an individual residing in Harris County, Texas.  Raj Rangwani has been served with process via first class United States mail, postage fully pre-paid, as identified in the Certificate of Service filed with the Court at Doc. 82, but has not yet appeared.

37.     Defendant Ravi Reddy is an individual residing in Harris County, Texas.  Ravi

Reddy has appeared.

38.     Defendant Ray Lindgren is an individual residing in Fort Bend County, Texas. Ray Lindgren has been served with process via first class United States mail, postage fully pre-paid, as identified in the Certificate of Service filed with the Court at Doc. 82, but has not yet appeared.

39.     Defendant Richard Robert is an individual residing in Harris County, Texas. Richard Robert has been served with process via first class United States mail, postage fully pre-paid, as identified in the Certificate of Service filed with the Court at Doc. 82, but has not yet appeared.

40.     Defendant Robert Odom is an individual residing in Harris County, Texas. Robert Odom has been served with process via first class United States mail, postage fully pre-paid, as identified in the Certificate of Service filed with the Court at Doc. 82, but has not yet appeared.

41.     Defendant Saifi, LLC is a Texas limited liability company. I can be served by serving process on its registered agent, Najmuddin Karimjee, 14511 Liscomb Drive, Houston, Texas 77084.

42.     Defendant Sanders 1998 Children's Trust is a Texas trust.  Sanders 1998 Children's Trust has been served with process via first class United States mail, postage fully pre-paid, as identified in the Certificate of Service filed with the Court at Doc. 82, but has not yet appeared.

43.     Defendant Sanders Opportunity Fund, LP. Is a Texas limited partnership.  Sanders Opportunity Fund LP has been served with process via first class United States mail, postage fully pre-paid, as identified in the Certificate of Service filed with the Court at Doc. 82, but has

not yet appeared.

44.    Defendant Sanjay Varma is an individual residing in Harris County, Texas. Sanjay Varma has been served with process via first class United States mail, postage fully pre-paid, as identified in the Certificate of Service filed with the Court at Doc. 82, but has not yet appeared.

45.    Defendant Shawn Goheen is an individual residing in Fort Bend County, Texas and can be served with process at 4707 Menlo Park Drive, Sugar Land, Texas 77479.

46.    Defendant Shreyaskumar Patel is an individual residing in Fort Bend County, Texas.  Shreyaskumar Patel has appeared.

47.    Defendant Steve Ittner is an individual residing in Harris County, Texas.  Steve Ittner has been served with process via first class United States mail, postage fully pre-paid, as identified in the Certificate of Service filed with the Court at Doc. 82, but has not yet appeared.

48.    Defendant Terry Luttrell is an individual residing in Harris County, Texas.  Terry Luttrell has appeared.

49.    Defendant Thai Nguyen is an individual residing in Harris County, Texas.  Thai Nguyen has been served with process via first class United States mail, postage fully pre-paid, as identified in the Certificate of Service filed with the Court at Doc. 82, but has not yet appeared.

50.    Defendant Theyen Hoang is an individual residing in Harris County, Texas. Theyen Hoang has been served with process via first class United States mail, postage fully pre-paid, as identified in the Certificate of Service filed with the Court at Doc. 82, but has not yet appeared.

51.    Defendant Thomas Boyd is an individual residing in Harris County, Texas and can be served with process at 5636 Winsome Lane, Houston, Texas 77057.

52.     Defendant TMCM Ventures, LP is a Texas limited partnership. TMCM Ventures, LP has appeared.

53.     Defendant Todd Stoner is an individual residing in Harris County, Texas. Todd Stoner has been served with process via first class United States mail, postage fully pre-paid, as identified in the Certificate of Service filed with the Court at Doc. 82, but has not yet appeared.

54.     Defendant Tom Pirtle is an individual residing in Harris County, Texas. Tom Pirtle has appeared.

55.     Defendant Tullis Thomas is an individual residing in Harris County, Texas. Tullis Thomas has appeared.

56.     Defendant Vincent Galeoto is an individual residing in Harris County, Texas. Vincent Galeoto has appeared.

57.     Defendant Warren G. King is an individual residing in Harris County, Texas. Warren G. King has appeared.

58.     Defendant Washington Ho is an individual residing in Harris County, Texas. Washington Ho has been served with process via first class United States mail, postage fully pre-paid, as identified in the Certificate of Service filed with the Court at Doc. 82, but has not yet appeared.

59.     Defendant William Marsh Resco I, LP is a Texas limited partnership. It can be served by serving process on its registered agent, Michael Eckland, 12002 Bellavista Ct, Houston, Texas 77041.

## II. JURISDICTION

60.     This Court has subject matter jurisdiction over the claims asserted in this case pursuant to 28 U.S.C. § 1334 because the claims of the Plaintiffs are claims "arising under title

11" and are claims "arising in or related to" a case under Title 11, United States Code. 11 U.S.C. § 101 *et seq.*

61.     Pursuant to 11 U.S.C. § 1334(c), this Court has exclusive jurisdiction of the property, wherever located, of Juliet and Brown as of the commencement of the bankruptcy cases and of property of Juliet's and Brown's estates.

62.     This case arises in or is related to a case under the Bankruptcy Code.  First, under 11 U.S.C. § 541, all property of Juliet and Brown as of the petition dates, becomes part of the estates; Juliet's and Brown's property includes claims and causes in action.  Under 11 U.S.C. § 542, the Trustees have the rights and powers sufficient to prosecute claims and causes in action on behalf of the estates.  Second, the majority of the liability of the estates to creditors now exists because of Juliet's and Brown's and/or their agents' transfer of assets to insiders and/or transfers made for a consideration that was not reasonable or substantially equivalent and that was made while Juliet and Brown were insolvent or had the effect of rendering the Juliet and Brown insolvent.

63.     The Trustees sue on behalf of Juliet's and Brown's estates to recover avoidable transfers in the minimum amounts scheduled on Trustees' Transfer Charts. (**Exhibit A**, transfer chart, attached and incorporated by reference as if fully set forth herein); 11 U.S.C. §§ 544, 547, 548, 550; TEX. BUS. & COM. CODE ANN. §§ 24.005, 24.006.

### III. VENUE

64.     Venue is proper in this Court pursuant to 28 U.S.C. §1409, because this is the district in which Juliet and Brown's bankruptcies are pending.

### IV. PROCEDURAL BACKGROUND

65.     On September 20, 2007, an involuntary petition for relief was filed under Chapter

11 of the United States Bankruptcy Code against Juliet and Brown by 5803 Richmond, Ltd., 6353 Interests, Ltd., 6409 Interests, Ltd. dba 802 Interests, Ltd.

66.     On October 19, 2007, Juliet and Brown filed their Motions to Convert Case from Chapter 7 to 11 and Motion to Consent to an Order for Relief from an Involuntary Petition for Chapter 7 to a Voluntary Chapter 11 under Title 11.  On October 31, 2007, Orders for Relief were entered in the causes.  Subsequently, Hill was appointed Trustee of Juliet's Chapter 11 estates.  Thereafter, on Hill's motion, Juliet's cases were converted to a Chapter 7.

67.     On December 5, 2007, Brown filed his Motion to Convert Case to Chapter 7.  On December 19, 2007, this Court converted Brown's case to Chapter 7.  Thereafter, Smith was appointed Trustee of Brown's Chapter 7 estate.

68.     In January 2008, Juliet and Brown filed bankruptcy schedules and statement of financial affairs.  Juliet's schedules were signed by Brown as Juliet's managing member.  Juliet scheduled creditors holding unsecured claims in excess of $7,900,000.00.  Brown scheduled creditors holding unsecured claims in excess of $5,000,000.00.

69.     The partners of Juliet (the "Juliet Partners") and percentage of partnership interest of Juliet were identified in its statement of financial affairs as follows:

| Douglas A. Brown | Class A | 29.375 |
| Bernie Kane | Class A | 29.375 |
| HHT (1998) Limited | Class A | 5.000 |
| FCP (1988) Limited | Class A | 5.000 |
| MJ Reddy | Class B | 0.625 |
| Varma Investments Ltd. | Class B | 0.587 |
| Melissa Thomas | Class B | 0.357 |

| | | |
|---|---|---|
| Gold Circle Inc. | Class B | 0.357 |
| Elizabeth C. Lemon | Class B | 0.587 |
| Christians Development Co. c/o Michael Benestante | Class B | 0.860 |
| 9745 Interests c/o David Greenberg | Class B | 0.860 |
| Warren King | Class B | 0.936 |
| Joon Rhee | Class B | 0.810 |
| Damazo Vidal | Class B | 1.250 |

70.     Juliet and Brown scheduled interests in 30+ partnerships or joint ventures[2] with scheduled "unknown" values (the "Juliet Project Partnerships").

71.     Juliet also scheduled nine separate bank accounts at Bank of America, First National Bank, Patriot Bank, Southwestern National Bank, and Tradition Bank with no or nominal bank deposits.

72.     Juliet reported gross income in its statement of financial affairs in the amounts of $525,694 for 2004, $1.5+ million for 2005, $24.7+ million for 2006, and $350,433 for 2007.

73.     On February 7, 2008, Hill and Smith held a joint section 341 meetings in Juliet's and Brown's cases.  The meeting was continued until March 13, 2008.  During the continued

---

[2] Juliet-Midtown Village, LP, Juliet-Markle Joint Venture, Juliet-Ballpark V Joint Venture, Juliet-Ballpark V LP (Sub), Juliet-Ballpark VI LP, Silverwood Ranch Partners LP, Juliet-Silverwood LP, Juliet-Reddy LP, Juliet-Glen Haven LP, Juliet-Delano LP, Juliet-Beaumont LP, Juliet-Atascocita I LP, Juliet-Kenny LP, Magnolia at Fleur Gardens (Galeoto), Magnolia at Fleur Gardens (HO), 1400 Gray Partners Ltd. (Chau), Tuscany Woods Interests LP, 6353 Richmond Phase II, Ltd., 6353 Richmond Phase III, Ltd., Juliet-SMB, LP, Juliet-Washington Square JV, Ballpark II Joint Venture, Juliet-Ballpark II Joint Venture, Juliet-Ballpark III, LP, Juliet-Washington Square North, LP, Juliet Homes-Washington Sq N LLC, Juliet-Briarhollow, LP, Juliet Homes-Ballpark III, LLC, Juliet-Westcott II LP, Juliet Reed Road LP, Juliet Odom LP, Juliet-Pirtle LP, Juliet-Nguyen LP, Juliet Homes - Greenbush Road LLC, Juliet Development Ltd., Juliet Development GP, LLC, Juliet Signature Series, LP, Juliet East Texas Development, LP, Juliet-Dominion Court, LP, ResCon Builders, LP, ResCon Group, LLC, Juliet GP, LLC, Juliet Homes, LLC, Juliet Homes, LP, The Market On Congress, Inc., First Texas Residential, Rescon Group, LP, Rescon Builders, LLC, Juliet Purchasing Services, LP, Bentley Capital, LP, Materials Financing Specialists, LP, and Counce Custom Homes, LLC (the "Juliet Entities").

creditors' meeting, Brown testified that he was the managing partner of Juliet GP, LLC (of which he held 100% of the stock) and that Juliet GP, LLC was the general partner for Juliet Homes, LP (of which he held 40% and Bernie Kane held 40%, with the remaining interests held by other investors).

74.    On September 29, 2008, Smith filed his Original Complaint Objecting to Discharge Pursuant to 11 U.S.C. § 727 against Brown in Adversary No. 08-3320.    After responding to Smith's Original Complaint, Brown subsequently agreed to waive his right to discharge as provided in Section 727(a)(10) of Title 11 of the Bankruptcy Code.

75.    On May 1, 2009, Smith and Hill filed their Motion to Approve Joint Prosecution Scheme requesting authority to jointly prosecute potential causes of action of the estates.  At the hearing on the Trustees' motion this court found the Trustees were acting in their respective authority for the Juliet and Brown estates and, therefore, found the Motion to be moot.

76.    On October 29, 2009, Trustees commenced their original complaint as Adversary Proceeding No. 09-03429 against individuals and entities. Trustees also commenced Adversary Proceeding Nos. 09-03441 and 09-03442 by filing their original complaints on October 30, 2009 that were substantively identical to Adversary Proceeding No. 09-03429.

77.    On December 2, 2009, Trustees filed their first amended complaint in Adversary No. 09-03429 to make two minor corrections that did not add any parties or causes of action.

78.    On February 26, 2010, Trustees filed a Motion for Leave to File Second Amended Complaint and for Extension of Time to Serve Defendants [Doc. No. 114].

79.    On December 16, 2010, the Court granted and denied in part Trustees' Motion for Leave to File Second Amended Complaint [Doc. No. 212].

80.    Trustees now file Trustees' Second Amended Complaint pursuant to the Court's

Order.

## V. FACTS

81.     For purposes of this lawsuit, Juliet Homes, LP, Juliet GP, LLC, and Doug Brown were acting in accord.   Therefore, all references hereinafter shall be to "Debtors."   Trustees attach various exhibits illustrating the allegations made herein, and such exhibits are by way of illustration only, not by way of limitation.   The examples are not exhaustive.

**A.     Summary of Various Components of Debtors' Scheme**

**1.     Builders**

**a.     Counce Custom Homes**

82.     Upon information and belief, Debtors were initially formed as a sales and marketing company, which hired third party home builders to build homes for ultimate sale to consumers.

83.     The Debtors' primary home builder was Counce Custom Homes, LP and Counce Custom Homes, GP, Inc.  (collectively "Counce"). Defendant James Counce was the president.

84.     In late 2005, however, Debtors took over control of Counce's remaining home inventory and construction draws due to Counce's alleged failure to pay its vendors.

85.     Subsequently, Counce Custom Homes, GP, Inc. forfeited its corporate charter on July 13, 2007, and Counce Custom Homes, LP was voluntarily dissolved on August, 28, 2009.

**b.     Rescon**

86.     Rescon Builders, LP and Rescon Group, LLC, its general partner, (collectively "Rescon") were formed in April 2005 and December 2004, respectively, for the purpose of building homes in the state of Texas and to become the  Debtors' home builder.

87.     On July 25, 2008, Rescon's business operations were "folded" into Juliet and

Rescon Group, LLC forfeited its corporate charter.

**2.      Investors**

88.      To raise money for operations, Debtors solicited cash investments from dozens of individuals and related entities, most of which were personally solicited by the Debtors and invested directly with the Debtors rather than through a brokerage house.

89.      Typically, these investors were sophisticated, well-educated individuals, familiar with the ins and outs of investing in a small business and real estate.

90.      To induce cash investments from the investors, the Debtors promoted themselves as a reputable and financially profitable real estate home builder and developer of in-town communities of affordable luxury homes.

91.      As of August 2005, Debtors represented to potential investors that they held a portfolio of 21 real estate projects with 1,344 residential units and $316 million of revenue over the subsequent 40 months.

**3.      Mortgage Lender**

92.       Debtors' revenues were promoted as being derived from home sales and mortgage financing via its interest in its mortgage partner Broyd, Inc. doing business as First Texas Residential ("First Texas Residential").

93.      In reality, however, Debtors used their associated entities as a conduit to line their own pockets as well as those of their spouses, girlfriends, family members, "preferred investors," and other co-conspirators, all at the expense of Juliet's less sophisticated investors, lenders, customers, subcontractors, laborers, and vendors.

**4.      Debtors' Project Partnerships**

94.      Many of the investors were offered limited partnership interests in one or more of

the Debtors' "Project Partnerships," which are single-purpose entities formed for specific real estate development projects.[3] (**Exhibit B**, Debtors' Project Partnerships summary from Debtors' accountants' records, which is attached and incorporated by reference as if fully set forth herein).

95.    Each Juliet Project Partnership was assigned to one project. The typical partnership agreement provided that Debtors would not contribute any capital, but would retain a majority interest in the partnership.

      a.     **Guaranteed Return on Investment**

96.    A typical partnership agreement provided for a 50% "guaranteed" return on the investment—a promise simply too good to be true.

97.    For example, on August 2, 2005, Debtors formed an agreement with Defendants Muduganti J. Reddy and Malladi S. Reddy stating that Defendant Malladi Reddy would contribute $200,000, and in return Debtors promised the following:

> Notwithstanding any of the terms of the Agreement to the contrary, Juliet and Brown guaranty to Reddy that the total amount of profit to be repaid under the Agreement to Reddy and Dr. Malladi S. Reddy, after return of all capital contributions, shall be no less than $100,000, to be paid no later than one year from the date hereof.

(**Exhibit C**, Joint Venture Agreement of Juliet-Silverwood at 4, which is attached and

---

[3] Debtors' Project Partnerships included the following entities: 324 Tropicana Interests, LP; 421 Fannin GP, LLC; Almeda Interests, Ltd; Ball Park II, JV; Ben Michael Medical Condominiums, LP; Bentley Capital, LP; Brown/Kane, LLC; DB Interest, Inc.; Faith Brown Interests GP, LLC; Juliet - Dominion Court, LP; Juliet - Silverwood, LP; Juliet Atascocita I, LP; Juliet- Ballpark VI, GP LLC; Juliet Ballpark VI, LP; Juliet- Briarhollow, LP; Juliet Development GP, LLC; Juliet Development, Ltd.; Juliet East Texas Development, LP; Juliet Glen Haven, LP; Juliet Homes- Ballpark III, LLC; Juliet Homes- Greenbusch Road LLC; Juliet Homes-Washington Sq N LLC; Juliet Homes-Washington Square North LP; Juliet Land Purchasing GP, LLP; Juliet-Midtown Village, LP; Juliet Mortgage Partners, LP; Juliet-Nguyen LP; Juliet-Odom LP; Juliet-Pirtle LP; Juliet Purchasing Services, LP; Juliet-Reddy, LP; Juliet-Reed Road, LP; Juliet Signature Series, LP; Juliet- SMB, LP; Juliet Westcott II, LP; LADF Holdings, LLC; Landcom Acquisition and Development Fund, LP; Main Hospital Development, LP; Main Hospital GP, LLC; Materials Financing Specialist, LP; Midtown Medical GP, LLC; Museum Medical Center, LLC; Rescon Builders, LP; Rescon Group, LLC; Silverwood Ranch Partners LP; The Market on Congress; and Washington Square Inv, LLC.

incorporated by reference as if fully set forth herein; *see also* **Exhibit D**, Addendum to Joint Venture Agreement of Juliet-Silverwood , which is attached and incorporated by reference as if fully set forth herein; *see also* **Exhibit B**, Project Partnerships at 3).

98.     Additionally, a similar agreement was made in July 2005 between Debtors and Defendant Pirtle Investments, LP.:

> General partner and Pirtle hereby agree as follows, notwithstanding any other provisions of the Agreement to the contrary:
> 1. Pirtle's capital contribution in the amount of $550,000.00 shall be repaid to Pirtle no later than October 1, 2005.
> 2. Pirtle's share of the profits shall be the greater of (i) $400,000.00 or (ii) the profits allocated to Pirtle under the Agreement.
> 3. Pirtle's profits shall be paid to it at the rate of $100,000.00 per month commencing on November 1, 2005 and continuing on the same day of each month thereafter until paid.
> 4. Pirtle shall receive an additional bonus distribution in the amount of $100,000.00 on January 28, 2006, in addition to the profit described in paragraphs one through three above.

(**Exhibit E**, Amendment to Limited Partnership Agreement of Juliet-Midtown Village, LP at 1, which is attached and incorporated by reference as if fully set forth herein).

### b.     Transfers to Defendant Investors

### i.     Consulting Fees

99.     As an added bonus, "preferred investors" would receive kickbacks in the form of cash payments, which were sometimes disguised as "consulting fees" on Debtors' books. *See, e.g.,* **Exhibit F**, TMOC Transaction Detail (Greenberg & Co. consulting fees); **Exhibit G**, Debtors' accounting record (Defendants Robert Odom and Thai Pham Nguyen Consulting Fees); **Exhibit H**, Debtors' accounting record (Bernie Kane Consulting Fees); **Exhibit I**, Debtors' accounting record (Theyen Hoang Consulting Fees), which are attached and incorporated by reference as if fully set forth herein.

### ii.       Money Order, Cashier's Check, and "Loans"

100.      Some investors were paid by money order or cashier's check.  Such payments to investors were neither reflected on Debtors' books nor reduced from their capital account.

101.      Other investors were transferred money, which were reflected on the Debtors' books as "loans."  (**Exhibit J**, Accounting Records Reflecting "Loans" to Defendants Alex Oria, Bernie Kane, Broyd Inc. dba First Texas Residential, and James Counce at 1,  which is attached and incorporated by reference as if fully set forth herein).

102.      In other instances, investors were paid directly by Pinnacle Title Company, LP ("Pinnacle Title") at real estate closings in order to prevent such transfers from being reflected on the Debtors' books.

### c.       Commingling of Assets

103.      The Debtors' partnership agreements provided the general partner the ability to transfer investors' funds from the assigned Juliet Project Partnership Account to an account held in the name of The Market On Congress, Inc. ("TMOC") to pay for Juliet's "general expenses."For example, in the Joint Venture Agreement of Juliet-Reed Road, which was executed on May 25, 2005, the Debtors and Julian Ferttita agreed to the following:

> Investor acknowledges that Juliet utilizes an umbrella company named The Market on Congress, Inc. ("TMOC") in order to perform all accounting functions and to receive and disburse funds for the various projects under the Juliet Homes organization. Thus, investor funds or proceeds from sales may be paid into accounts of TMOC and expenses of Juliet may be paid from accounts of TMOC. Complete and accurate records of all such receipts and disbursements will be kept by TMOC and will be available for audit at all reasonable times and locations.

(**Exhibit K**, Juliet-Reed Road Joint Venture Agreement at Art. 10.8, attached and incorporated by reference as if fully set forth herein).

104.      Therefore, rather than depositing investors' funds and loan proceeds into accounts

held by a particular Juliet Project Partnership, Debtors instead commingled such funds without distinction by depositing them into deposit accounts held by Doug Brown, Caroline Brown d/b/a Sorella Group, Juliet Homes, LP, Juliet Homes, LLC, The Market On Congress, Inc., Bentley Capital, LP, and Juliet Purchasing Services, LP.

105.   The commingling of investors' funds and loan proceeds had the effect of rendering such funds virtually untraceable.

106.   Debtors used the commingled funds to make partnership distributions and pay kickbacks to investors and other co-conspirators under the guise of consulting fees and/or extension fees.

107.   Such payments were made without regard to whether the particular development project, in which an investor held a partnership interest, had generated any distributable profits.

108.   Consequently, at the expense of Debtors and their legitimate creditors, Debtors diverted millions of dollars in commingled funds as it pleased to line its principals' pockets and finance their lavish lifestyles while paying investors exorbitant "guaranteed" returns in order to attract new investors to perpetuate the scheme.

**d.      Investor "Buyouts"**

109.   Whenever Debtors failed to pay investors the returns promised it would placate them through various forms of payments, including consulting fees, extension fees, promissory notes secured by deeds of trust, and buyout agreements. Debtors' practice of converting investors' equity interests into secured debt obligations effectively rendered Debtors insolvent.

110.   For example, on December 20, 2005, Debtors and Defendant Fertitta entered into a buyout agreement agreeing that Defendant Fertitta would obtain $1,000,000.00 on his $500,000 investment only six months after his investment and when no profit had been received

on such investment. (**Exhibit L**, Buyout Agreement for Juliet-Reed Road Joint Venture and **Exhibit M**, Reed Road Accounting File, which are attached and incorporated by reference as if fully set forth herein).

### 5.   Straw Buyers

111.   Debtors' insiders, employees, and other co-conspirators acted as "straw buyers" in numerous "resale transactions," which deprived Debtors of a substantial amount of sale proceeds to which it was entitled.[4]

112.   In the typical transaction, Debtors entered into a "sale" with the straw buyer, where Debtors "sold" a certain piece of property to the straw buyer. (**Exhibit N**, Settlement Statement, which is attached and incorporated by reference as if fully set forth herein).

113.   Debtors then executed phony lease agreements with the straw buyers stating that Debtors would lease the property from the straw buyer for a certain period of time and during that time Debtors would be obligated to pay the straw buyers as follows:

> (i) All principal and interest payments on the mortgage secured by the Property,
> (ii) all tax and insurance escrows, maintenance or condominium association fees,
> (iii) any other expense associated with the Property for each calendar month of
> the term, and (iv) $2,500.00, payable in advance on the first day of each such
> calendar month....

(**Exhibit O**, Lease Between Debtors and Straw Buyer Carolee Taylor, which is attached and incorporated by reference as if fully set forth herein).

114.   Debtors' also drafted phony "invoices" in which the straw buyers "billed" Debtors for their monthly rent. (**Exhibit P**, Straw Buyer Carolee Taylor Invoice; attached and incorporated by reference as if fully set forth herein).

---

[4] Trustees' have sued the following straw buyers in adversary proceeding 09-03435: Defendants Joanna Gober, Eric Putnam, Joey Perez, James Crable, Eugenio Aguilar, Carolee Taylor, Anthony Fitzpatrick, Edward B. O'Hair, and Ashley L. O'Hair.

115.    Upon resale of the property from the straw buyer to a legitimate buyer, Debtors paid the straw buyer a lump sum payment as a "lease buyout." (**Exhibit Q**, Check to Straw Buyer Carolee Taylor, attached and incorporated by reference as if fully set forth herein).

116.    In some instances, the resale transaction would result in a projected net loss to the straw buyer/seller.  Nonetheless, Juliet incurred such losses by wiring to Pinnacle Title the funds necessary to cover any amounts owed by the seller at closing.

### 6.    Pinnacle Title Company

117.    Pinnacle Title Company and its affiliates played a critical role in Debtors' scheme as it served as the title policy provider and the escrow company for most of the sale and loan transactions which are the subject of Trustees' Complaint.

118.    Defendant Warren King ("King"), the director of Pinnacle Title, handled all closings and received fees ranging from $1,500 to $3,000 per transaction in most, if not all, real property sale and loan closings involving the Debtors.

119.    King authorized disbursements of monies to fictitious lienholders using sale and loan proceeds to which the Debtors were entitled.

120.    King transferred funds from Debtors' escrow accounts to other escrow accounts held by King, Brown, investors and other co-conspirators.

121.    King drafted and amended HUD-1 settlement statements in accordance with instructions to divert monies to Brown, investors, and other co-conspirators.

122.    All such actions and transfers orchestrated by Pinnacle Title, King, and Debtors were done with the intent to hinder, delay, or defraud Debtors' legitimate creditors.

### B.    Summary of the Debtors' Scheme

123.    Broyd, Inc. d/b/a First Texas Residential, an entity owned and controlled by

Brown, Caroline Brown and Thomas Boyd, originated most if not all of the mortgage loans in the sales of Juliet's properties. First Texas Residential received loan origination fees, yield spread premiums, and other fees ranging from $1,500 to $7,000 per transaction, which were then split between Brown, Caroline Brown, and Thomas Boyd. Such fees were charged against Juliet's account for the benefit of Brown, Caroline Brown, Broyd, Inc. d/b/a First Texas Residential and Thomas Boyd, and effectively deprived Juliet of substantial sale proceeds to which it was entitled. In order to induce buyers to use First Texas Residential, Brown had Juliet offer to give buyers a 42" flat screen television valued at approximately $3,500 to $4,500 per unit. The televisions were purchased at Juliet's expense and conferred no benefit upon Juliet.

124.   Upon information and belief, First Texas Residential, Brown, Caroline Brown, and Thomas Boyd falsified information about borrowers on mortgage applications by overstating income, employment, and the source of funds to be used for down payments. As a result, numerous straw buyers and legitimate buyers acquired homes they could not afford and became obligated for mortgage loans for which they would not have been able to qualify.

125.   Brown, Caroline Brown, Thomas Boyd, and First Texas Residential "approved" borrowers for mortgage loans by overstating income and misrepresenting the source of funds to be used for down payments. After originating the loans, First Texas Residential immediately sold the notes and deeds of trust to secondary market investors including Wall Street investment banks such as Lehman Brothers and government-sponsored entities such as Fannie Mae. Since the secondary market investors relied solely on representations made by First Texas Residential and performed no due diligence on the borrowers and/or collateral, First Texas Residential was able to sell any mortgage it originated regardless of the credit risk of the borrower or value of the underlying collateral. However, the subprime collapse in the summer of 2007 caused the

secondary market to shut down which, in turn, resulted in the inability of First Texas Residential to sell its toxic mortgage loans. First Texas Residential never intended to keep any mortgages on its books and had insufficient capital to fund the loans itself. Consequently, Juliet lost its primary source of financing for its homebuyers which decimated its sales and caused its financial condition to rapidly decline.

126.    Juliet's lack of revenue, inability to attract new debt and equity capital, the lavish lifestyles of its principals, the extravagant gifts to spouses and girlfriends, and the exorbitant funds necessary to continue paying the investors their guaranteed returns caused the real estate investment scheme to unravel. To placate the investors, Juliet issued promissory notes secured by deeds of trust in exchange for their partnership/equity interests. Upon information and belief, the typical promissory note included as principal the initial investment plus the promised returns. An additional 18% interest was promised in some cases. The terms of the promissory notes given ranged from a period of two weeks to one year. Juliet continued to pay "consulting fees" equivalent to 10% of the initial investment regardless of whether the investor was entitled to receive a distribution at that time. Such fees were not deducted from the balance owed, but were simply paid as "icing on the cake."

127.    Millions of dollars were paid out of Juliet and TMOC to individuals, affiliate entities, insiders and "preferred investors," while many subcontractors and vendors remained unpaid for the work performed on the residences constructed for Juliet. This money was used to purchase luxury vehicles and expensive personal items for principals, their spouses, their girlfriends and other co-conspirators. It was acquired through the use of false invoices to Juliet from fictitious vendors, contractors, and subcontractors for services that were never actually performed and/or supplies that were never purchased. Such companies include a nonexistent

stonework company and a design firm allegedly owned by Connie Brown, Brown's mother.

128.    Brown and Caroline Brown used TMOC to divert millions of dollars belonging to Juliet through checks and wire transfers from accounts held by Juliet and Pinnacle Title.  Brown used affiliate entities including, but not limited to TMOC, Pinnacle Title, First Texas Residential, Juliet Purchasing Services, Rescon, Counce Custom Homes, LLC ("Counce"), Bentley Capital, LP ("Bentley Capital"), and Materials Financing Specialists, LP ("Material Financing Specialists") to funnel monies from Juliet to himself, to insiders, to investors, and to other co-conspirators.

129.    Brown, Caroline Brown, and Thomas Boyd used First Texas Residential to divert funds to which Juliet was entitled at property sale closings by having Juliet pay fees for mortgage brokerage services Brown allegedly provided to homebuyers.  In reality, no such services were provided.  First Texas Residential received fees equal to 2% of the purchase price on the sale of each Juliet property, thereby reducing the proceeds available for distribution to Juliet at closing.  In addition, to entice Juliet's customers not to use another mortgage company, Brown had Juliet offer to give them 42" plasma screen televisions, all of which were purchased with Juliet's funds.  Brown, who held an ownership interest in Pinnacle Title, required that all Juliet closings be handled through and by King of Pinnacle Title.  King, who also held an ownership interest in Juliet and in Pinnacle Title through his interest in Builders Title Company GP, Inc., directed distributions of monies at closings to Brown's entities, investors, fictitious lienholders, and other co-conspirators in order to line Brown's and his own pockets at the expense of Juliet and its legitimate creditors.

130.    Brown used Juliet Purchasing Services to place purchase orders for all building materials, and would then bill Juliet for the actual cost plus 10% (5% markup and 5%

administrative fee).  The 10% profit Juliet Purchasing Services received on each transaction would then be distributed to Brown, investors, and other insiders and co-conspirators.  The resulting inflation of Juliet's building costs effectively reduced its bottom line, and, therefore, the amount of funds it had available to pay legitimate creditors.

131.    Closing statements reflect exorbitant real estate commissions paid by Juliet to insiders and other co-conspirators, some of which exceeded 10% of the purchase price; whereas, the average market rate in similar transaction is in the 5% to 6% range.  The excessive fees charged against Juliet's account in most closings ultimately reduced the amount of proceeds Juliet received on each sale.  In addition, Erica Zemaitis, Brown's girlfriend at the time, received commissions of $5,000 on numerous Juliet Homes sales transactions which were reflected on closing statements as commission paid to "Realty Associates."  Juliet would receive no benefit from the brokerage services purportedly performed by Erica Zemaitis, rather, Juliet's proceeds were merely reduced by $5,000 for her benefit.  As such, Juliet did not receive reasonably equivalent value for any of the commissions paid to Erica Zemaitis.  For example, Erica Zemaitis was paid $6,759 on September 30, 2005 for representing Carolee Taylor, Juliet's chief financial officer, in the purchase of a Juliet property located at 318 Gregg Street.   Clearly, Juliet did not receive reasonably equivalent value or fair consideration in exchange for the commission paid to Zemaitis for a sale to an insider.

132.    Brown testified at the Initial § 341 Creditors Meeting, that he leased the Lupton Lane (Cedarwood Sec. 1, Block 1, Lot 8, Harris County, 8617 Lupton Lane, Houston, Texas 77055) property out to Robert Odom ("Odom"), who paid the mortgage by doing purported consulting work for one or more of the Juliet Partnerships. And, even though Odom was, in essence, living there free (purportedly as his salary), he got an additional salary from Juliet in the

amount of $20,000/month, which Brown testified was money paid in advance for a project Odom was bringing to the table – a project that never came to fruition for Juliet. Additionally, in a December 15, 2006 Receipts and Disbursements Ledger regarding the sale of a piece of property in Silverwood Ranch by Juliet LP to Lawrence H. Ramming, there are distributions to ARCOA Funding, LC in the amount of $37,500.00 and to Odom of $225,000.00. Juliet did not receive reasonably equivalent value as a result of this transaction; rather, it was deprived of proceeds that should have first been distributed to Juliet's legitimate creditors and then to investors in amounts equal to their percentage interest in profits.

133.    Juliet paid kickbacks to insiders, employees, relatives and other co-conspirators who acted as "straw buyers" in the purchase and sale of homes in Juliet's inventory. The typical arrangement provided that Juliet would sell the property to the person acting as the straw buyer and then lease the property back for a period of time. The lease agreements provided that Juliet would pay the straw buyer/landlord $2,000 per month and cover all costs of ownership including monthly mortgage payments, insurance premiums, maintenance fees, and any other costs incurred as a result of owning the property. Some agreements provided for a cash payment of $20,000 at the end of the lease term. In all instances Juliet was obligated to purchase the property back at the same price paid by the straw buyer. Additionally, email correspondence and bank records reflect that buyers were reimbursed for monies paid at closing including but not limited to down payments and closing costs. These transactions were not negotiated at arm's-length and were for the personal benefit of Juliet insiders and other co-conspirators at the expense of Juliet and its legitimate creditors.

134.    From its inception, Juliet's real estate investment program had all the attributes of a classic Ponzi scheme: (1) deposits by investors, (2) little legitimate business as represented to

investors; (3) the legitimate business produces little profits or earnings, and (4) payments to subsequent investors are made with prior investor funds. *Floyd v. Dunson (In Re Ramirez Rodriguez),* 209 B.R. 424, 431 (Bankr. S.D. Tex. 1997).  Over 50 investors invested in excess of $20 million with Juliet.

135.    The rate of return paid by Juliet to the investors ranged from 25% on the low end to more than 100% on the high end.  Such returns were not financially feasible, especially given the amount of profits being skimmed off of the top by Juliet insiders and other co-conspirators.

136.    Juliet had insufficient funds from the business operations that were capable of generating funds necessary to pay the promised returns to the investors.  When funds were received from the investors, the funds were deposited and commingled without distinction with other funds into Juliet's operating bank accounts and/or the bank accounts of TMOC, Juliet Purchasing Services, LP, Juliet Homes, LP, Juliet Homes/Washington Square North, LLC, and Juliet Homes, LLC.

137.    The commingled investor funds were used to pay earlier investors, operating expenses, administrative costs, and to line the pockets of Brown, Kane, their spouses and girlfriends, and other insiders and co-conspirators.

138.    Most, if not all, profits Juliet made from the sale of its homes were ill-gotten gains derived from either fraudulently procured mortgage loans or equity investments which amount to fictitious profits.

139.    Almost all courts have held that a debtor does not receive reasonably equivalent value or fair consideration for any payments made to its investors which represent fictitious

profits.[5]

140.    Therefore, all profit payments to investors represent fictitious profits for which Juliet received neither reasonably equivalent value nor fair consideration.   In addition, Juliet did not receive reasonably equivalent value for interest payments to investors because any derived "use-of-funds" value from the investors' money was used to perpetuate the fraudulent scheme.

141.    All transfers to investors were by Juliet with intent to hinder, delay, or defraud Juliet's existing and future creditors.

142.    In addition, Juliet's operation of a Ponzi scheme establishes actual intent to defraud on the part of the transferor as a matter of law[6].   Therefore, Trustees are entitled to

---

[5] See Sender v. Buchanan (In re Hedged-Invs. Assocs., Inc.), 84 F.3d 1286, 1290 (10th Cir. 1996) (holding that a debtor operating a Ponzi scheme does not receive reasonably equivalent value in exchange for any amounts it transfers to an investor in excess of the investor's principal investment); Scholes v. Lehmann, 56 F.3d 750, 757 (7th Cir. 1995) (holding that a debtor does not receive fair consideration under Illinois version of UFCA for transfers of fictitious profits paid pursuant to Ponzi scheme); Eby v. Ashley, 1 F.2d 971, 973 (4th Cir. 1924) (amounts paid in excess of principal amounts deemed without consideration); Scholes v. Ames, 850 F. Supp. 707, 715 (N.D. Ill. 1994) (holding that payments received in good faith by investors in a fraudulent investment scheme in excess of the principal invested were "voluntary gifts" and hence fraudulent conveyances that could be recovered by receiver), aff'd sub nom., Scholes v. Lehmann, 56 F.3d 750 (7th Cir. 1995); In re Taubman, 160 B.R. 964, 987 (Bankr. S.D. Ohio 1993) (holding that transferees did not give debtor value in exchange for transfers they received in excess of amounts they invested); Jobin v. Lalan (In re M&L Bus. Mach. Co.), 160 B.R. 851, 858 (Bankr. D. Colo. 1993) ("For this excess received by an investor in a Ponzi scheme the Debtor does not receive a reasonably equivalent value, nor does the investor give value for this excess."); Merrill v. Abbott (In re Independent Clearing House Co.), 77 B.R. 843, 857 (D. Utah 1987) ("We conclude that the debtors received a 'reasonably equivalent value' in exchange for all transfers to a defendant that did not exceed the defendant's principal undertaking but, to the extent a defendant received more than he gave the debtors, the debtors did not receive a reasonably equivalent value."). See also In re Baker & Getty Fin. Servs., Inc., 88 B.R. 792 (Bankr. N.D. Ohio 1988) (following Independent Clearing House); Lawless v. Anderson (In re Moore), 39 B.R. 571, 573 (Bankr. M.D. Fla. 1984) (finding no reasonably equivalent value for fictitious profits in the absence of contrary authority).

[6] Scholes v. Lehmann, 56 F.3d 750, 757 (7th Cir. 1995); Hayes v. Palm Seedlings Partners (In re Agricultural Research and Tech. Group, Inc.), 916 F.2d 528, 535 (9th Cir. 1990) (holding that a debtor's actual intent can be inferred from the mere existence of a Ponzi scheme); Plotkin v. Pomona Valley Importers, Inc. (In re Cohen), 199 B.R. 709, 717 (B.A.P. 9th Cir. 1996) (same); Jobin v. Ripley (In re M&L Bus. Mach. Co.), 198 B.R. 800, 806 (D. Colo. 1996) (the only inference to be drawn from the operation of a Ponzi scheme is actual intent to defraud); Levey v. Razee (In re Mary S. Pate), No. 95 A 985, slip op. at 6 (Bankr. N.D. Ill. Feb. 21, 1997) (holding that a debtor running a Ponzi scheme possesses actual intent to hinder, delay and defraud creditors); Martino v. Edison Worldwide Capital (In re Randy), 189 B.R. 425, 438 (Bankr. N.D. Ill. 1995) (same); Brandt v. American Nat'l Bank (In re Foos), 188 B.R. 239, 244 (Bankr. N.D. Ill. 1995) ("When a debtor is operating a Ponzi scheme he knows that he is going to defraud certain investors as sooner or later he will run out of money. Therefore, when an action is brought to recover payments that were part of the Ponzi scheme it is reasonable to presume an intent to defraud."); Jobin v. Waukau (In re M&L Bus. Mach. Co.), 166 B.R. 723, 724 (Bankr. D. Colo. 1993) (same); Taubman, 160 B.R. at 983 (holding that it is appropriate to find actual intent from debtor's active participation in

recover any transfers made to investors, regardless of whether a particular transfer represented a principal, interest, and/or profit payment, unless that Defendant meets its burden of establishing an *objective* good faith defense.

## VI. CAUSES OF ACTION

143.   In each claim stated below, Trustees incorporate by reference the averments of all other paragraphs of this Complaint and Trustees' Transfer Chart (**Exhibit A**) as if fully set forth therein.

### A.   Preferential Transfer under 11 U.S.C. § 547

144.   Trustees incorporate by reference all preceding paragraphs and all attachments as if fully set forth herein.

145.   Pursuant to 11 U.S.C. §547(b), Trustees may avoid any transfer of an interest of the debtor in property:

(1)    to or for the benefit of a creditor;

(2)    for or on account of an antecedent debt owed by the debtor before such a transfer was made;

(3)    made while the debtor was insolvent;

(4)    made:

    (A)    within 90 days before the date of the filing of the petition; or

    (B)    made within one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5)    that payment enables such creditor to receive more than such creditor would if:

    A)    the case were a case under Chapter 7 of this title;

    B)    the transfer had not been made; and

    C)    such creditor received payment of such debt to the extent provided by the provisions of this title.

---

Ponzi scheme); *Jobin v. Lalan (In re M&L Bus. Mach. Co.)*, 160 B.R. 851, 857 (Bankr. D. Colo. 1993) ("In a Ponzi scheme the only inference a court can make is that the Debtor had the requisite intent to hinder, delay or defraud under § 548(a)(1)."), aff'd, 167 B.R. 219 (D. Colo. 1994).

146.    Debtors' transfers were made to or for the benefit of creditors (the Defendants on the Transfer Charts).

147.    Transfers to the creditors were on account of an antecedent debt.

148.    Transfers were made while Debtors were insolvent.

149.    Transfers were made within ninety (90) days, and to insiders within one year, before the petition dates.

150.    The transfers made enabled the investors to receive more than such creditor would receive if (1) the case were administered under Chapter 7 of the Bankruptcy Code; (2) the transfer had not been made; and (3) such creditor received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

151.    Transfers were made to Defendants, to entities for the benefit of Defendants, or to entities that constitute the alter ego of Defendants as identified on the transfer chart, Exhibit A.

152.    Such transfers constitute preferential transfers that the Trustees may avoid pursuant to 11 U.S.C. § 547.

153.    Trustees invoke 11 U.S.C. § 550 to the extent necessary.

154.    In support of the foregoing and to show the transferees and the minimum amounts transferred for which the Trustees seek relief, reference is hereby made to Trustees' Transfer Charts attached hereto.

**B.    Fraudulent Transfer under 11 U.S.C. § 548**

155.    Trustees incorporate by reference all preceding paragraphs and all attachments as if fully set forth herein.

156.    The Bankruptcy Code provides the following as to fraudulent transfers and obligations:

(a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily--

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C.A. § 548(a)(1).

157.    As to the transfers made by Debtors identified on the Transfer Charts, Debtors (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud an entity to which Debtors were or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or (B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and (ii)(I) were insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation; (II) were engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with Debtors was an unreasonably small capital; (III) intended to incur, or believed that Debtors would incur, debts that would be beyond their

ability to pay as such debts matured; or ; (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

158.    Transfers were made to Defendants, to entities for the benefit of Defendants, or to entities that constitute the alter ego of Defendants as identified on the transfer chart, Exhibit A.

159.    Trustees invoke 11 U.S.C. § 550 to the extent necessary.

**C.    Fraudulent Transfer under Tex. Bus. & Com. Code 24.005.**

160.    Trustees incorporate by reference all preceding paragraphs and all attachments as if fully set forth herein.

161.    Under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), transfers are fraudulent as to present and future creditors in the following circumstances:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>
> (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

Tex. Bus. & Com. Code Ann. § 24.005(a).

162.    As explained above, Trustees are entitled to recover the transfers identified in the Transfer Charts pursuant to Tex. Bus. & Com. Code Ann. § 24.005.  Transfers were made or obligations incurred by Debtors, which were fraudulent as to creditors, whether the creditor's

claim arose before or within a reasonable time after the transfer was made or the obligation was incurred, because Debtors made the transfers or incurred the obligations:  (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

163.    Transfers were made to Defendants, to entities for the benefit of Defendants, or to entities that constitute the alter ego of Defendants as identified on the transfer chart, Exhibit A.

164.    Trustees invoke 11 U.S.C. § 550 to the extent necessary.

**D.     Fraudulent Transfer under Tex. Bus. & Com. Code Ann. § 24.006**

165.    Trustees incorporate by reference all preceding paragraphs and all attachments as if fully set forth herein.

166.    Under TUFTA, transfers are fraudulent as to present creditors in the following circumstances:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

> (b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

Tex. Bus. & Com. Code Ann. § 24.006

167.    As explained herein, Trustees are entitled to recover the transfers identified in the Transfer Charts pursuant to Tex. Bus. & Com. Code Ann. § 24.006.  Transfers were made or obligations incurred by Debtors, which were fraudulent as to creditors whose claims arose before the transfer was made or the obligation was incurred, because the Debtors made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

168.    Transfers were also fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the Debtor was insolvent at that time, and the insider had reasonable cause to believe that the Debtor was insolvent.

169.    Transfers were made to Defendants, to entities for the benefit of Defendants, or to entities that constitute the alter ego of Defendants as identified on the transfer chart, Exhibit A.

170.    Trustees invoke 11 U.S.C. § 550 to the extent necessary.

**E.      Piercing the Corporate Veil / Alter Ego / Sham to Perpetrate a Fraud**

171.    Trustees incorporate by reference all preceding paragraphs and all attachments as if fully set forth herein.

172.    The corporate veil of all Juliet Entities should be pierced or recognized as collapsed as these entities are alter egos of their principals and/or were used as a sham to perpetrate a fraud on Plaintiffs.  There is such an identity or unity between the Debtors and the Juliet Entities that separateness between the parties ceased and a failure to disregard the corporate form would be unfair or unjust.  The Juliet Entities were organized and operated as a mere tool or business conduit Debtors.  At all times, the entities were run by and for the personal

benefit of Debtors and are the agents and instrumentalities through which they conducted business. Thus, the Juliet Entities were nothing more than alter egos of Brown and Juliet.

173.    The Juliet Entities commingled funds, diverted company profits to Brown, investors, and other insiders and co-conspirators for personal use, were undercapitalized, and failed to keep corporate and personal assets separate.  Juliet commingled funds from all Juliet Entities in the account held by TMOC and such funds were then diverted to Brown, investors, and other insiders.  Upon information and belief, the Juliet Entities were undercapitalized with the intent to defraud, hinder or delay creditors and for the purpose of enabling Brown and Juliet to control and obtain assets without performing the obligations and duties they are liable to perform.  A finding of alter ego is appropriate where the entity is used as a mere tool or business conduit of another entity or individual.  Alter ego is shown from the total dealings of the entity and the individual.  Courts have generally described alter ego indicia as follows:

(a)    whether the corporation has been used for personal purposes;

(b)    the amount of financial interest, ownership and control the individual maintains over the corporation;

(c)    the degree to which corporate formalities have been kept; and

(d)    the degree to which corporate and individual property have been kept separate.

174.    To perpetrate the fraud on Juliet's creditors, Brown caused to be siphoned off corporate revenues to his own benefit and to the benefit of investors and other insiders and co-conspirators.  In addition, Brown had Juliet issue promissory notes and deeds of trust in exchange for equity interests held by investors, thereby depleting the remaining shareholder equity and ultimately rendering Juliet insolvent.

175.    The Trustees request that declaratory judgment be entered declaring that the Juliet Entities are alter egos of Brown and Juliet and as such, all assets owned, controlled or held by the Juliet Entities should be determined to be the assets of Brown and Juliet.

F.    **Fraud**

i.    **Common Law Fraud**

176.    Trustees incorporate by reference all preceding paragraphs and all attachments as if fully set forth herein.

177.    This cause of action of fraud is alleged against the following Defendants: (1) Warren King; (2) Caroline Brown; (3) Thomas Boyd; and (4) First Texas Residential.  As alleged herein, these Defendants made material misrepresentations to Debtors when Defendants knew the misrepresentations were false or made recklessly and without knowledge of their truth, with the intent that Debtors rely on the misrepresentations, and Debtors did rely on the misrepresentations.

ii.    **Statutory Fraud in a Real Estate Transaction**

178.    Trustees incorporate by reference all preceding paragraphs and all attachments as if fully set forth herein.

179.    This cause of action of statutory fraud in a real estate transaction is alleged against the following Defendants: (1) Warren King; (2) Caroline Brown; (3) Thomas Boyd; and (4) First Texas Residential.  As alleged herein, the Defendants' fraudulent acts and/or omissions constitute fraud in a real estate transaction, in violation of Tex. Bus. & Com. Code Ann. § 27.01. The Defendants made false representations of material facts and/or benefitted from not disclosing that a third party's representation or promise was false with the purpose and intention of inducing Debtors and to enter into real estate transactions, and Debtors and relied on such

representations in entering into and performing the transactions.  Moreover, the Defendants made the false representations and/or benefitted from not disclosing that the representations were false with actual awareness of their falsity.

**G.    Constructive Fraud**

180.    Trustees incorporate by reference all preceding paragraphs and all attachments as if fully set forth herein.

181.    This cause of action of constructive fraud is alleged against the following Defendants: (1) Warren King; (2) Bernie Kane; (3) Malladi Reddy; (4) Melissa Thomas; and (5) Damazo Vidal.

182.    As alleged herein, these Defendants are alleged to have been partners with Debtors, and by virtue of their relationship owed duties, including fiduciary duties, to Debtors their conduct constitutes constructive fraud as described herein.

**H.    Conversion / Misappropriation of Assets / Unjust Enrichment**

183.    Trustees incorporate by reference all preceding paragraphs and all attachments as if fully set forth herein.

184.    To the extent investors wrongfully and without authority assumed and used the Brown Estate's and/or the Juliet Estates' assets, such actions constitute conversion. Therefore, investors are liable for the loss and injury sustained by the Estates as a natural and proximate result of their actions.

185.    Alternatively, to the extent investors diverted and misappropriated the Brown Estate assets and/or the Juliet Estates' assets to the detriment of those Estates' creditors and/or were unjustly enriched by the transfer of those Estates' assets, investors are liable for the loss and injury sustained by the Estates due to such misappropriation or unjust enrichment.

186.    In support of the foregoing and to show the transferees and the minimum amounts transferred for which the Trustees seek relief, reference is hereby made to Trustees' Transfer Charts attached hereto.

## I.    Punitive Damages

187.    Trustees incorporate by reference all preceding paragraphs and all attachments as if fully set forth herein.

188.    Trustees are entitled to punitive damages from each of the following Defendants: (1) Warren King; (2) Caroline Brown; (3) Thomas Boyd; (4) First Texas Residential; (5) Bernie Kane; (6) Malladi Reddy; (7) Melissa Thomas; and (8) Damazo Vidal.

189.    These Defendants willfully, callously, and/or with reckless indifference participated in directly or took no action to prevent the acts or omissions identified herein that led to the Debtors' loss of assets and exhibited a willful, callous and/or reckless indifference to the rights of the bankruptcy estates and its creditors, such conduct warrants assessment of punitive damages in this case against them.

## J.    Attorneys' Fees and Costs

190.    Trustees incorporate by reference all preceding paragraphs and all attachments as if fully set forth herein.

191.    Trustees request recovery of their reasonable attorneys' fees  and costs as are equitable and just pursuant to Tex. Bus. & Com. Code Ann. § 24.013.

## VII.  PRAYER

Trustees respectfully request that the Court enter judgment in their favor and against the Defendants on all causes of action set forth herein and for the relief requested herein, including an award of fees, costs, exemplary damages, and pre- and postjudgment interest. Trustees also requests such other relief to which they may be justly entitled.

Dated: April 18, 2011

Respectfully submitted,

*/s/ Susan H. Jacks by permission JRS*
Susan Hardie Jacks
Attorney-in-Charge
State Bar No. 08957600
S.D. Texas I.D. No. 4192
susanjacks@mehaffyweber.com
500 Dallas, Suite 1200
Houston, Texas 77002
Phone: (713) 655-1200
Fax: (713) 655-0222

ATTORNEYS FOR JOSEPH M. HILL,
TRUSTEE and W. STEVE SMITH,
TRUSTEE

OF COUNSEL:
MEHAFFY WEBER, P.C.

Ernest W. Boyd
State Bar No. 00783694
S.D. Texas I.D. No. 23211
ernestboyd@mehaffyweber.com
Jeremy R. Stone
State Bar No. 24013577
S.D. Texas I.D. No. 27060
jeremystone@mehaffyweber.com
Christal A. Delgado
State Bar No. 24054954
S.D. Texas I.D. No. 1059248
christaldelgado@mehaffyweber.com
500 Dallas, Suite 1200
Houston, Texas 77002
Phone: (713) 655-1200
Fax: (713) 655-0222

and

JOSEPH F. ARCHER, P.C.
Joseph F. Archer
500 Dallas, Suite 3400
Houston, Texas 77002
(713) 654-7799
(713) 654-7814

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this document was served on April 18, 2011, electronically on those persons who receive electronic notification from the court, and by U.S. Mail, on all others, as indicated below:

/s/ Jeremy R. Stone
Jeremy R. Stone

Susan J Brandt **(Electronic)**
Ronald Sommers
Nathan Sommers Jacobs
2800 Post Oak Blvd, 61st Fl
Houston, TX 77056-6102

Kendall Johan Burr **(Electronic)**
Edison, McDowell & Hetherington LLP
Phoenix Tower
3200 Southwest Freeway, Suite 2920
Houston, TX 77027

William Allen Gage, Jr. **(Electoronic)**
Buck Keenan, L.L.P.
700 Louisiana, Suite 5100
Houston, Texas 77002

Patrick D Devine **(Electronic)**
Attorney at Law
5120 Woodway Dr., Suite 8002
Houston, TX 77056

Bennett G Fisher **(Electronic)**
Fisher and Associates, PC
1800 Two Houston Center
909 Fannin Street
Houston, TX 77010-0000

Steven A. Leyh  **(Electronic)**
Leyh & Payne, LLP
9545 Katy Freeway, Suite 200
Houston, TX 77024

Peter Johnson **(Electronic)**
Law Offices of Peter Johnson
Eleven Greenway Plaza, Suite 2820
Houston, TX 77046

T. Josh Judd **(Electronic)**
Hoover Slovacek, LLP
5847 San Felipe, Suite 2200
Houston, TX 77057

Dr. Malladi Reddy **(U.S. Mail)**
2045 Space Park Dr., Suite 180
Houston, Texas 77058-6304

John T Unger **(Electronic)**
Thompson Knight
333 Clay, Suite 3300
Houston, TX 77002

Steve Martin Williard **(Electronic)**
The Williard Law Firm LP
1920 N Memorial Way, Suite 207
Houston, TX 77007

Douglas Allen Brown **(U.S. Mail)**
456 Victoria Terrace
Fort Lauderdale, FL 33301

Warren G King **(U.S. Mail)**
Attorney at Law
9999 Bellaire Blvd, Suite 725
Houston, TX 77036

Raj M. Rangwani **(U.S. Mail)**
3934 FM 1960 West, Suite 210
Houston, TX 77068

Lawrence Hugo Ramming **(U.S. Mail)**
50 Briar Hollow East, Suite 210
Houston, TX 77027

Randall A Rios **(Electronic)**
Munsch Hardt et al
700 Louisiana, Ste 4600
Houston, TX 77002

Marilee A Madan **(Electronic)**
Marilee A Madan PC
3109 Avalon Pl
Houston, TX 77019