# EXHIBIT C

JOINT VENTURE AGREEMENT
OF
JULIET- SILVERWOOD JOINT VENTURE

The parties, Juliet Homes, LLC ("Juliet"), and Muduganti J. Reddy and Malladi S. Reddy ("Investors"), by this Agreement mutually agree to engage in and carry on, as joint venturers, to purchase lots and construct single family residences thereon for resale and profit.

RECITALS

A. Juliet has entered into an agreement to acquire the land described as Silverwood Ranch, an addition in Montgomery County, Texas, according to the map or plat thereof recorded in Cabinet Y, Sheet 19 of the Map Records of Montgomery County, Texas (the "Property"). Juliet plans to build thereon approximately 80 single family dwellings (the "Homes") for resale.

B. Juliet has agreed to hold title to the Property as undisclosed agent for the account of the Joint Venture (as hereinafter defined) until the completion and sale of the Homes.

In consideration of the mutual benefit to be derived, the parties hereto form a joint venture for the purpose of buying and developing the Property and building Homes thereon for resale and profit, all in accordance with the following terms:

ARTICLE I
SCOPE AND DESCRIPTION

1.1. By this Agreement, the parties create a joint venture to purchase the Property for single family home development and resale and profit. The joint venture shall be conducted under the name of Juliet-Silverwood Joint Venture (the "Joint Venture"), with its principal place of business at 14905 Southwest Freeway, Suite 201, Sugar land, Texas 77478.

ARTICLE II
CAPITAL CONTRIBUTIONS

2.1. <u>Nature and Amount of Contributions</u>. The nature and amount of the capital contributions of each party to the Joint Venture are as follows:

(a) Malladi S. Reddy is to contribute $200,000.00 and is not obligated to contribute any additional capital;

(b) Muduganti J. Reddy will provide all necessary marketing and consulting services for the project; and

(c) Juliet will contribute its interest in the Property and any necessary additional capital to

1

develop single family homes on the Property.

No joint venture partner shall be entitled to withdraw any portion of the capital contribution without the express written consent of the other joint venture partner.

## ARTICLE III
## RIGHTS, POWERS, AND DUTIES

3.1. <u>Specific Rights, Powers, and Duties</u>. In conducting the Joint Venture, each party shall assume the duties hereinafter set forth and shall have the authority and power reasonably necessary to carry out those duties:

(a) Each Partner shall have a duty to use its best efforts toward the success of the Joint Venture, and each Partner shall owe a fiduciary duty to the other to fully disclose any matter which comes to its attention or knowledge that would assist or hamper the Joint Venture to accomplish its goals. Each Partner agrees to execute any document or instrument necessary to accomplish the joint purposes set forth in this Agreement.

(b) Juliet shall have responsibility for purchasing, subdividing the Property and constructing single family homes on the Property and marketing and selling the Homes. Juliet shall be responsible for all marketing and sales expense.

(c) In order to accomplish said duties Juliet will contract with a turnkey builder who shall have the duty to build the Homes and sell the completed Homes to Juliet or to buyers of Juliet's choosing at a pre-determined price. Juliet shall have the authority to determine the terms of such agreements, including the price at which the completed Homes shall be delivered to Juliet and the price to be paid by the ultimate buyers therefor.

(d) Juliet shall have management authority for the day-to-day operations of the Joint Venture, including, without limitation, management authority with respect to marketing and selling the Homes and entering into any agreements in connection with the marketing and selling of same, such as listing agreements, earnest money contracts and the like. All of the foregoing management duties shall be deemed to be in the ordinary course of business of the Joint Venture.

## ARTICLE IV
## TITLE TO PROPERTY

4.1 <u>Title for Convenience Only</u>. Juliet acknowledges that title to the Property will be placed in its name for convenience only and that the Lots will be owned in fact by the Joint Venture Partners according to their respective interests.

## ARTICLE V.
## DIVISION OF PROFITS

2

5.1   Preferred Payment. The "First Preferred Payment" shall mean one half of the Distributable Cash, as hereinafter defined, until each Investor has received the return of all of his capital contribution, to be paid to Investors as each Home is sold.

5.2 Second Preferred Payment. The "Second Preferred Payment" shall mean the amount of Juliet's actual out-of-pocket expense incurred by Juliet in constructing the Homes, and marketing and selling the Homes, calculated according to generally accepted accounting principles, but only those expenditures that are made specifically for the Silverwood project, and any additional cash contribution made by Juliet as a capital contribution to the Joint Venture.

5.3.   Distribution of Proceeds Arising from a Sale. All cash receipts of the Joint Venture arising from the sale of a Home, Lot, or the Property shall, as soon as practicable after the occurrence of the sale, be applied, in the priority, provided by law or any applicable agreement or undertaking of the Joint Venture, to

> (i) payment, to the extent applicable, of all amounts required to be disbursed in connection with such sale (which shall include sales commission payable to any person);

> (ii) payment of all debts and obligations of the Joint Venture then due, related to the sale;

> (iii) creation of reasonable cash reserves for and provision for the payment of the taxes and other costs, expenses, and liabilities related to the sale;

> (iv) payment of all other debts and obligations of the Joint Venture then due, other than to a Venturer (including all expenses directly relating to the development of the Property and construction of the Homes, and the marketing and sale of the Homes, including all other expenses attributable to the Joint Venture according to generally accepted accounting principles, consistently applied); and

> (v) creation of reasonable cash reserves considered appropriate in the good faith judgment of Juliet to provide for payment of and to pay taxes, debt service, insurance, repairs, replacements or renewals and/or other costs, expenses and liabilities of the Joint Venture, payment of which is then due and for which cash receipts are not expected by Juliet to be received prior to the time such payments are required to be made.

The amount of cash receipts from a sale remaining after the foregoing applications is called "Distributable Cash."

Distributable Cash shall, as promptly as practicable after the applications provided above, be distributed by the Joint Venture, as follows:

> (a) First, Joint Venture funds shall be allocated as described in Paragraph 5.1 until Investors receive in the aggregate the First Preferred Payment.

3

(b) Second, Joint Venture funds shall be allocated 100% to Juliet until Juliet receives in the aggregate the Second Preferred Payment.

(c) Thereafter, the remaining Joint Venture profits shall be allocated and distributed to Investor until he has received all of his capital contribution plus $100,000.00. TO BE PAID NO LATER THAN ONE YEAR FROM DATE.



(d) Thereafter, all Joint Venture Funds shall be allocated to Juliet.

(e) All distributions to Investors shall be paid solely to Malladi S. Reddy until Malladi S. Reddy has received the return of all of his capital contribution plus a return on investment in the amount of 24%, computed on an annualized basis. Thereafter, all profit distributions to Investors shall be paid solely to Muduganti J. Reddy. Muduganti J. Reddy will guaranty Malladi S. Reddy's return of capital and a 24% annual return for a period of up to one year.

5.4. <u>Computation of Profits</u>. The following procedure shall be used for the purpose of computing Joint Venture profits, as between the parties:

(a) Expenses of conducting the Joint Venture shall first be deducted from profits. These expenses shall include all expenses directly relating to the development of the Property and construction of the Homes, and the marketing and sale of the Homes, and all other expenses attributable to the Joint Venture according to generally accepted accounting principles, consistently applied. Notwithstanding the foregoing, no commission for real estate brokerage or marketing services shall be paid to any Partner, any Partner's affiliate, any individual having ownership in a Partner, or any family member of any individual having ownership in a Partner.

(b) After contributions in money or property have been returned, any party who is required to contribute time to the Joint Venture shall not be entitled to any reimbursement for its time from the assets of the Joint Venture before the amount remaining for distribution as income or profits is determined.

## ARTICLE VI
## ASSIGNMENTS AND TRANSFERS

During the term of this Agreement, no party may assign or transfer his or her rights and interests in the Joint Venture without the prior written consent of all Joint Venture Partners. Any transfer or assignment of any party's interest in the Joint Venture or its profits shall be subject to the rights and obligations provided in this Agreement. No transfer or assignment shall relieve any party of his or her duties or obligations under this Agreement except with the express written consent of all Partners.

4

## ARTICLE VII
## INSOLVENCY OR BANKRUPTCY OF PARTY

If, during the term of this Agreement, a party hereto should become insolvent or bankrupt, the remaining Partner shall have the option to dissolve and wind up the Joint Venture in accordance with the provisions of the Texas Revised Partnership Act, except insofar as its provisions may be at variance with the terms of this Agreement, or continue the business of the Joint Venture, excluding the insolvent or bankrupt party, on payment to it or to the person or persons as a court of competent jurisdiction shall direct, its contribution to the capital assets of the Joint Venture less accrued expenses and the further payment of any accrued profits attributable to its contribution.

## ARTICLE VIII
## EFFECTIVE DATE AND TERM

8.1. *Effective Date*. The effective date of this Agreement shall be the date of its execution by all parties.

8.2. *Term of Agreement*. This Agreement shall continue in effect until all purposes for which this Joint Venture has been undertaken have been accomplished and completed or until dissolved by written agreement of the parties.

## ARTICLE IX
## TERMINATION

On the termination of this Agreement, pursuant to its terms, or as the result of the mutual agreement of all the parties to this Agreement, or the impossibility of performance caused by the failure of a party to contribute as agreed, or for any other reason, the Joint Venture shall be dissolved and wound up in accordance with the provisions of the Texas Revised Partnership Act, except insofar as its provisions may be at variance with the terms of this Agreement. Upon termination Investors shall receive their initial capital contribution as a preferred payment prior to the distribution of assets to the other joint venture partners.

## ARTICLE X
## GENERAL

10.1 Time is of the essence in this Agreement with respect to the performance covenants of the parties hereto.

10.2   All notices that are required or that may be given pursuant to the terms of this Agreement shall be in writing and shall be sufficient in all respects if given in writing and delivered personally or by registered or certified mail, return receipt requested, postage prepaid as follows:

If to Juliet:         Attn: Douglas A. Brown
                      14905 Southwest Freeway, suite 201

Sugar Land, TX 77478

If to Investors :   Attn: Muduganti J. Reddy
24811 Boulder Lake Court
Katy, Texas 77494

10.3   This Agreement shall be binding on and inure to the benefit of the parties to this Agreement and their respective successors and permitted assigns. This Agreement may not be assigned by any other party without the written consent of all parties and any attempt to make an assignment without consent is void.

10.4   This Agreement shall be construed and governed by the laws of the state of Texas.

10.5   This Agreement may be amended only in writing by the mutual consent of the parties, evidenced by all necessary and proper corporate authority. No waiver of any provision of this Agreement shall arise from any action or inaction of any party, except an instrument in writing expressly waiving the provision executed by the party entitled to the benefit of the provision.

10.6   This Agreement, together with any documents and exhibits given or delivered pursuant to this Agreement, constitutes the entire agreement between the parties to this Agreement. No party shall be bound by any communications between them on the subject matter of this Agreement unless the communication is (a) in writing, (b) bears a date contemporaneous with or subsequent to the date of this Agreement, and (c) is agreed by all parties to this Agreement. On execution of this Agreement, all prior agreement or understandings between the parties shall be null and void.

10.7   The name "Juliet Homes" is the exclusive property of Juliet Homes, LLC and Investors does not by virtue of this agreement acquire any rights, now or in the future, to the use of said name.

10.8   Investor acknowledges that Juliet utilizes an umbrella company named The Market on Congress, Inc. ("TMOC") in order to perform all accounting functions and to receive and disburse funds for the various projects under the Juliet Homes organization. Thus, investor funds or proceeds from sales may be paid into accounts of TMOC and expenses of Juliet may be paid from accounts of TMOC. Complete and accurate records of all such receipts and disbursements will be kept by TMOC and will be available for audit at all reasonable times and locations.

10.9   Investors represents that they are sophisticated investors and the nature and amount of the capital contributions they agree to make hereunder is consistent with their investment program and that they have sufficient liquid assets to absorb the loss of their entire investment in the joint venture. They has been furnished with sufficient written and oral information about the joint venture, the contemplated business of the joint venture, and/or Juliet to allow them to make an informed investment decision prior to purchasing an interest in the joint venture, and have been furnished access to any additional information that they may require. They (i) have adequate means

6

of providing for their current needs and possible personal contingencies and (ii) have no need, and anticipates in the foreseeable future no need, to sell their interest in the joint venture. Each Investor is able to bear the economic risks of this investment and is able to hold his joint venture interest for an indefinite period of time. Investors understand that there is no guarantee that the joint venture will be profitable.

    Executed this 2nd day of August, 2005.

Juliet Homes, LLC

By: _____
    Douglas A. Brown, Managing Member

_____
Malladi S. Reddy

_____
Muduganti J. Reddy

juliet-silverwood-reddy