

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

**ENTERED**
**12/28/2011**

| | | |
|---|---|---|
| **IN RE:** | § | |
| **JULIET HOMES, LP,** | § | **Case No. 07-36424** |
| **Debtor(s).** | § | |
| | § | **Chapter 7** |
| | § | |
| **JOSEPH M HILL CH 7 TRUSTEE,** *et al*, | § | |
| **Plaintiff(s)** | § | |
| | § | |
| **VS.** | § | **Adversary No. 09-03429** |
| | § | |
| **ALEX ORIA,** *et al*, | § | |
| **Defendant(s).** | § | **Judge Isgur** |

## <u>MEMORANDUM OPINION</u>

The chapter 7 Trustees in the bankruptcy cases of Juliet Homes, LP; Juliet GP, LLC (collectively, "Juliet Debtors"); and Douglas Brown filed this proceeding on October 29, 2009, suing dozens of defendants for preferential transfers, fraudulent transfers under both the Bankruptcy Code and the Texas Uniform Fraudulent Transfer Act, unjust enrichment, and legal fees. ECF No. 1. The Trustees also sought to pierce the corporate veil of various entities affiliated with the Juliet Debtors. ECF No. 1, at 18. From the beginning, the Trustees have alleged that the Juliet Debtors operated a Ponzi scheme, eventually engaging in little legitimate business and providing excessive rates of return to initial investors.[1]

The Trustees' allegations have expanded during the course of this proceeding. The Trustees have amended their complaint twice. The most recent amendment was the Second Amended Complaint, ECF No. 229. The Court allowed the Trustees to file the Second Amended Complaint after lengthy hearings and extensive briefing. The Court denied the Trustees' request

---

[1] The Trustees allege that the Juliet real estate investment program had the attributes of a Ponzi scheme "[f]rom its inception." The exact commencement date of the alleged Ponzi scheme may be irrelevant to the Trustees' claims; the issue is whether the Ponzi scheme is alleged to have been in place at the time of the alleged transfers.

to add dozens of new defendants but allowed the Trustees to add new allegations and claims. *See* ECF No. 213.  The Second Amended Complaint elaborates on the allegations of a Ponzi scheme and includes a detailed chart of allegedly preferential and/or fraudulent transfers ("Transfer Chart").  The Second Amended Complaint also adds new causes of action for common-law fraud, statutory fraud in a real estate transaction, and constructive fraud, expands the unjust enrichment cause of action into a "conversion/misappropriation of assets/unjust enrichment" claim, and seeks punitive damages.  ECF No. 229.

In response, several defendants ("Movants") have filed motions to dismiss.  This Memorandum Opinion deals with the issues raised in fifteen separate motions to dismiss.  ECF Nos. 233, 236, 253, 255, 256, 257, 258, 260, 261, 262, 264, 266, 267, 270 & 271.  The Court grants, in part, and denies, in part, the motions.

## Background

This adversary proceeding is connected to the bankruptcy cases of Juliet Homes, LP ("Juliet Homes"); No. 07-36424; Juliet GP, LLC ("Juliet GP"), No. 07-36426; and Douglas A. Brown, No. 07-36422.  Creditors filed involuntary petitions against each of the three Debtors on September 20, 2007.

Brown and the Juliet Debtors are closely related.  On his Schedule B, Brown noted that he was the 100% owner of Juliet GP and the 28.376% owner of Juliet Homes.  No. 07-36422, ECF No. 56, at 20.  The Juliet Debtors list interests in each other, of unspecified percentages, on their respective schedules.  No. 07-36426, ECF No. 23, at 8; No. 07-36424, ECF No. 111, at 7. Brown is listed as the Managing Member of Juliet GP on Juliet GP's Schedules and on Juliet Homes' Schedules.  No. 07-36426, ECF No. 23, at 4, 20; No. 07-36424, ECF No. 111, at 14.

According to the Second Amended Complaint, Brown testified at the joint creditors' meeting for the three cases that Juliet GP was the general partner for Juliet Homes.  ECF No. 229, at 12-13.

On Debtors' motion, the Court entered orders for relief in the three cases on October 31, 2007.  The Court converted Juliet Homes' case and Brown's case to chapter 11 on the same day. On November 2, 2007, Joseph Hill, plaintiff in this adversary proceeding, became Trustee over the Juliet Debtors' estates.   On Hill's motion, the Court reconverted Juliet Homes' case to chapter 7 on December 3, 2007.

Brown moved to reconvert his individual case to chapter 7 on December 5, 2007, and the Court granted his motion on December 19, 2007.  Steve Smith, also a plaintiff in this adversary proceeding, became Trustee of Brown's chapter 7 estate.

On October 29, 2009, the Trustees filed this adversary proceeding against Brown, other individuals who were alleged to be investors in the Juliet Debtors, and five entities alleged to be affiliated with the Juliet Debtors.  The Original Complaint alleged that Brown and the Juliet Debtors had made avoidable preferential and/or fraudulent transfers to themselves, their affiliates, and their investors under §§ 547 and 548 of the Bankruptcy Code and under Texas law.

The Trustees alleged that Brown and the Juliet Debtors had engaged in a Ponzi scheme, providing financially infeasible returns to preferred investors and partners while ultimately engaging in little legitimate business.

The Trustees alleged, for example, that Brown and his partner Bernie Kane charged exorbitant consulting fees against the Juliet Debtors' accounts and purchased luxury vehicles and expensive personal items out of the Debtors' funds.  The Trustees also alleged that Brown and Kane issued false invoices from fictitious vendors and subcontractors and that Brown and his wife, Caroline Brown, diverted Juliet funds to Brown himself, affiliated entities, and affiliated

individuals.  The Trustees additionally alleged that the Juliet Debtors paid kickbacks to insiders, employees, relatives, and other co-conspirators to act as "straw buyers" in the purchase and sale of homes.

On December 2, 2009, the Trustees filed their Amended Complaint.  The Amended Complaint made minor changes to the Original Complaint and was filed within the time allowed by Fed. R. Civ. P. 15(a)(1).

On February 26, 2010, the Trustees filed a Motion for Leave to File Second Amended Complaint and for Extension of Time to Serve Defendants.  ECF No. 114.  The Proposed Second Amended Complaint expanded the scope of the claims, providing more detail about the alleged Ponzi scheme and adding a chart that showed all of the allegedly fraudulent and preferential transfers.  The new allegations emphasized the involvement of an entity called The Market on Congress ("TMOC").  The Trustees alleged that TMOC was used to funnel money from the Debtors into other entities and to individual investors.

The Proposed Second Amended Complaint would have added dozens of new defendants.  The proposed new defendants, along with existing defendants, opposed the amendment.  After extensive litigation, the Court allowed, in part, the amendment on December 16, 2010.  ECF No. 213.  The Court allowed the Trustees to expand their allegations and add new causes of action, but (with a few exceptions) the Court did not allow the Trustees to add new defendants.  ECF No. 213, at 48.  The statutes of limitations on all claims had already run, and the Court found that the claims against nearly all the proposed new defendants did not relate back to the date of the original complaint.

The Trustees filed the Second Amended Complaint on April 18, 2011.  ECF No. 229.  The Second Amended Complaint adds the new claims and allegations and incorporates the

Transfer Chart, a modified version of the chart that was attached to the Proposed Second Amended Complaint.  ECF No. 229-1.

Numerous defendants filed motions under Fed. R. Civ. P. 12, seeking to have claims dismissed or struck or to require a more definite statement.  A joint motion to dismiss was filed by Don Sanders; Sanders 1998 Children's Trust; Sanders Opportunity Fund, LP;  and Sanders Opportunity Fund (Institutional), L.P. (collectively, "Sanders Defendants").  ECF No. 233.  A joint motion to dismiss, or in the alternative, for a more definite statement was also filed by Marquis Capital II Westcott, LP d/b/a Marquis Capital; Marquis Capital II, LLC; Michael Ecklund; and William Marsh Resco I, LP (collectively, "Marquis Defendants").  ECF No. 261.

David Greenberg and Greenberg & Co. (collectively, "Greenberg Defendants") filed a motion to strike and, in the alternative, motion to dismiss.  ECF No. 236.  Tom Pirtle and Pirtle Investments, L.P. ("Pirtle Defendants") filed a motion to strike, or in the alternative, motion to dismiss, or in the alternative, motion for a more definite statement.  ECF No. 253.

Ravi Reddy, Shreyaskumar Patel, and Warren King filed motions to dismiss and, alternatively, for a more definite statement.  ECF Nos. 256, 264 & 270.  Robert Shiring, Richard Robert, Tullis Thomas, Julian Fertitta, Vincent Galeoto, Mir Azizi, and Melisa Thomas filed motions to dismiss.  ECF Nos. 255, 257, 258, 262, 266, 267 & 271.  Alex Oria and James Thomas filed a joinder in the Pirtle Defendants', Shiring's, Reddy's, Robert's, and Tullis Thomas's motions.  ECF No. 260.

Although the fifteen motions differ as to the particular arguments, all of the Movants argue that the Trustees' claims should be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief may be granted.

The Greenberg Defendants also argue that claims should be struck.  When the Court did not allow the Trustees to add new defendants, the Trustees then alleged that some of the alleged transfers to the proposed new defendants had actually been received by or for the benefit of David Greenberg.  The Trustees thus asserted new claims for those transfers against Greenberg. The Greenberg Defendants argue that the addition of these claims violates the Court's December 16, 2010 order and memorandum opinion, which did not allow the Trustees to add new defendants because the statute of limitations had already run against those proposed defendants.

The Pirtle Defendants, finally, argue that the inclusion of Pirtle Investments, LP as a defendant should be struck.  Pirtle Investments, LP, due to a clerical error, was not issued a summons, and the original complaint allegedly was not served on Pirtle Investments, LP.  The Pirtle Defendants argue that Pirtle Investments, LP is therefore a "new defendant," and the Court's December 16, 2010 order prohibits the addition of new defendants.

### Rule 12(b)(6) Standard

The Court reviews motions under Rule 12(b)(6) "accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiffs."  *Stokes v. Gann*, 498 F.3d 483, 484 (5th Cir. 2007) (per curiam).  However, the Court "will not strain to find inferences favorable to the plaintiff."  *Southland Sec. Corp. v. INSpire Ins. Solutions Inc.*, 365 F.3d 353, 361 (5th Cir. 2004) (internal quotations omitted).

To avoid dismissal for failure to state a claim, a plaintiff must meet Fed. R. Civ. P. 8(a)(2)'s pleading requirements.  Rule 8(a)(2) requires a plaintiff to plead "a short and plain statement of the claim showing that the pleader is entitled to relief."  In *Ashcroft v. Iqbal,* the Supreme Court held that Rule 8(a)(2) requires that "the well-pleaded facts" must "permit the court to infer more than the mere possibility of misconduct."  129 S.Ct. 1937, 1950 (2009)

(quoting Rule 8(a)(2)).  "Only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id.* (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  "[A] complaint does not need detailed factual allegations, but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true raise a right to relief above the speculative level."  *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (internal quotation marks removed).

Fraud claims must, in addition, meet Fed. R. Civ. P. 9(b)'s heightened pleading requirements.  Under Rule 9(b), fraud claims must be alleged with particularity concerning the circumstances of the fraud.  Fed. R. Civ. P. 9(b).  *See Oppenheimer v. Prudential Sec. Inc.*, 94 F.3d 189, 195 (5th Cir. 1996) (upholding district court's dismissal of fraud claims where the plaintiff failed to allege when an allegedly fraudulent sales charge was incurred or the extent of her damages); *Red Rock v. JAFCO Ltd.*, 1996 WL 97549, at *3 (5th Cir. Feb. 16, 1996) (holding that the plaintiff's allegations did not satisfy Rule 9(b) where they failed to allege the time, place, or content of any misrepresentations).  "To plead fraud adequately, the plaintiff must 'specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent.'"  *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 551 (5th Cir. 2010) (quoting *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002)).

A motion under Rule 12(b)(6) will be treated as one for summary judgment under Rule 56 when matters outside the pleadings are presented and not excluded by the Court.  Fed. R. Civ. P. 12(d); Fed. R. Bankr. P. 7012(b).  Under Rule 56, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056.  In the

event a motion to dismiss is converted to one for summary judgment, a court must first give the parties notice and then may consider all evidence presented. *Rodriguez v. Rutter*, 310 F. App'x 623, 626 (5th Cir. 2009).

### Analysis

The Movants argue that the Trustees fail to plead essential facts as to some of the claims. The Court examines each claim against each of the Movants to determine whether the Trustees have stated a claim.

Additionally, some Movants argue that claims are barred by the statute of limitations. Under 11 U.S.C. § 546(a), avoidance claims had to have been brought no later than October 31, 2009, two years after the entry of the orders for relief in the bankruptcy cases. Under 11 U.S.C. § 108(a), claims asserted on behalf of the estate had to have been brought by the later of October 31, 2009 or the expiration of the statute of limitations under non-bankruptcy law.

It is too late to assert new avoidance claims, and the Court has already held that equitable tolling does not apply. The Court therefore considers whether any new transfers relate back to the date of the original complaint.

As to claims asserted on behalf of the estate, the Court considers whether the claims relate back to the date of the original complaint or whether the non-bankruptcy law statute of limitations has not yet expired.

### 1. Greenberg and Pirtle Defendants' Motion to Strike

The Court first deals with the motions to strike. The Greenberg Defendants argue that the Court's December 16, 2010 order and memorandum opinion do not allow the Trustees to assert new claims for additional transfers against Greenberg. Greenberg was named as a defendant in

the original complaint.  The Court thus considers whether its December 16, 2010 memorandum opinion prohibits the addition of new avoidable transfer claims against Greenberg.

In the December 16, 2010 memorandum opinion, the Court held that the proposed Second Amended Complaint did not relate back to the original complaint under Fed. R. Civ. P. 15(c)(1)(C) for the purposes of adding new parties.  Under Rule 15(c)(1)(C), an amended pleading changing a party or the naming of a party relates back to the date of the original pleading if the claim arises out of the conduct, transaction, or occurrence set out in the original pleading *and* if the party to be brought in by the amendment "(i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity."

The Court held that the addition of new defendants did not relate back under Rule 15(c)(1)(C) because the Trustees' failure to include those defendants in the original complaint was not a mistake of identity.  ECF No. 213, at 15.  The Court "assume[d] without deciding that the claims against the new defendants satisf[ied] the requirement of Rule 15(c)(1)(B) that 'the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading.'"  ECF No. 213, at 15 (quoting Fed. R. Civ. P. 15(c)(1)(B).  The Greenberg Defendants argue that the Court's ruling prohibits the Trustees' assertion of claims for the very same transfers against Greenberg.

Contrary to the Greenberg Defendants' argument that the Court's December 16, 2010 memorandum opinion precludes amendment to include the additional transfers, the opinion disallows only the addition of the new defendants.  The Court did not decide whether the transfers related back under Rule 15(c)(1)(B).

Additionally, the Greenberg Defendants argue that the Second Amended Complaint violates the Court's order because it adds actual fraud claims. The Second Amended Complaint does not purport to add actual fraud claims, and the Court does not construe the Trustees' allegations regarding fraudulent transfers as de facto fraud claims.

The Court denies the Greenberg Defendants' motion to strike, but considers below the new question of whether the new transfer claims against Greenberg relate back to the time of the original complaint.

The Court next deals with the Pirtle Defendants' motion to strike. The Pirtle Defendants argue that the Second Amended Complaint must be struck or dismissed as to Pirtle Investments, LP. The Pirtle Defendants argue that Pirtle Investments, LP was not properly included as a defendant in the original complaint and that claims against Pirtle Investments, LP therefore do not relate back to the original complaint. Pirtle Investments, LP was listed as a defendant in the original complaint. ECF No. 1, at 2. However, due to a clerical error, Pirtle Investments, LP was not listed in the parties and service section of the complaint and was not issued a summons. The Pirtle Defendants assert that Pirtle Investments, LP was not served with the original complaint. ECF No. 253, at 7. The Trustees' failure to timely serve Pirtle Investments, LP may well be grounds for dismissal of Pirtle Investments, LP as a party. It is not, however, grounds for striking the Trustees' Second Amended Complaint. Pirtle Investments, LP was named as a defendant in the original complaint. The clerical failure, service error, and lack of a summons are distinct from the issues dealt with in the Court's December 16, 2010 order and memorandum opinion. The Pirtle Defendants are free to seek dismissal on the basis of these procedural problems. However, the Court denies the motion to strike, because these procedural problems have not yet been litigated and decided by the Court.

**2.  Relation Back of New Transfer Claims**

Because the Trustees now seek only to add the transfers against existing defendants, the Court now considers whether the transfers arose out of the same conduct, transaction, or occurrence set out in the original complaint.  The Court concludes that the newly alleged transfers arose out of the same conduct, transaction, or occurrence set out in the original complaint.  The new claims therefore relate back to the time of the original complaint.

Under Rule 15(c)(1)(B), a  new claim relates back to the date of the original complaint if it arises out of the same conduct, transaction or occurrence.  New fraudulent transfer claims may relate back to existing fraudulent transfer claims if the newly alleged transfers were part of the same "course of conduct."  *Adelphia Recovery Trust v. Bank of America, N.A.*, 624 F. Supp. 2d 292, 334 (S.D.N.Y. 2009).  In *Adelphia*, the court held that additional fraudulent transfers related by where they were all related to the same "Co-Borrowing Facilities."  *Id.*

The Court must consider two questions:

> (1) Does the Second Amended Complaint allege that the new transfers occurred as part of the same course of conduct as the transfers alleged in the original complaint?

> (2) Did the original complaint give sufficient notice to the defendants that the Trustees may sue for additional transfers that were part of the same course of conduct?

*See Adelphia*, 624 F. Supp. 2d at 334 (holding that "the addition of new fraudulent transfers to a complaint 'relates back' if the fraudulent transfers arise from the same course of conduct"); *Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re Fabrikant & Sons, Inc.)*, 447 B.R. 170, 181 (Bankr. S.D. N.Y. 2011) ("The principal inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party by the general fact situation alleged in the original pleading.") (internal quotation marks omitted); *see In re*

*Slaughter Co. & Assocs.*, 242 B.R. 97, 102 (Bankr. N.D. Ga. 1999) ("If the original complaint indicates an intention to pursue all transfers, the addition of transfer will relate back, but where the additional transactions are truly separate and do not arise from a common core of operative facts, the amendment should not be allowed.").

The Court concludes that the new fraudulent transfers were part of the same course of conduct as the transfers alleged in the original complaint. From the time of the original complaint, the Trustees have alleged an overarching Ponzi scheme. The Trustees have consistently alleged that the Debtors ultimately conducted very little legitimate business and primarily existed to divert money to preferred investors and insiders. The fraudulent transfers alleged in the original complaint, along with the new transfers alleged in the Second Amended Complaint, are alleged to have been part of this overall Ponzi scheme. Both the original and the newly alleged fraudulent transfers therefore arose as part of the same course of alleged conduct.

The original complaint also gave the Movants notice that the Trustees might sue for transfers that were part of the same course of conduct. The allegations of the Ponzi scheme gave reasonable notice that the Trustees would seek to recover any amounts that may have been transferred as part of that scheme, including partnership distributions, consulting fees, sales proceeds, lease payments, and similar transfers. The defendants to the Second Amended Complaint were included in the original complaint, and because the original complaint alleged that Juliet conducted little legitimate business and mostly existed to divert funds, the defendants were on notice that the Trustees would likely view *any* transfers from the Debtors as potentially fraudulent.

The new fraudulent transfer claims relate back under *Adelphia*. However, courts have typically held that preferential transfers cannot be part of a "course of conduct," reasoning that

each preferential transfer is a separate transaction. *See Adelphia*, 624 F. Supp. 2d at 334 ("[P]reference actions stand in contrast to actions to avoid fraudulent transfers, which often involve a common scheme to defraud which provides a nexus for relation back.") (quoting *In re Austin Driveway Servs., Inc.*, 179 B.R. 390, 398 (Bankr. D. Conn. 1995)); *Fabrikant & Sons*, 447 B.R. at 182 ("In avoidance litigation [regarding preferential transfers], each transfer is treated as a separate transaction for purposes of applying the 'relation back' doctrine");*In re Metzeler*, 66 B.R. 977, 984 (Bankr. S.D.N.Y. 1986) (noting that "courts have consistently treated preferential transactions as separate and distinct under Rule 15(c)" and reasoning, contrary to later case law, that fraudulent transfers should be treated the same way). Fraudulent transfers, on the other hand, may arise out of a single fraudulent scheme and are connected by the fraudulent intent that underlies all the transfers. *Adelphia*, 624 F. Supp. 2d at 334.

It is true that preferential transfers, in the absence of unifying fraudulent intent, probably are not part of a course of conduct. However, when preferential transfers occur in the context of a fraudulent scheme, there is no reason why they cannot be regarded as part of that course of conduct. This Court concludes that preferential transfers may be part of a course of conduct when they are alleged to have occurred alongside fraudulent transfers as part of an overarching scheme. The Court therefore rules that the newly alleged fraudulent and preferential transfers relate back to the original complaint. Because the newly alleged transfers relate back to the original complaint, they are not barred by limitations.

### 3. Transfers to or for the Benefit of Defendants

However, even if a transfer relates back for Rule 15 purposes, the Trustees have not stated a claim against any of the defendants if they do not adequately plead that the transfer was made to or for the benefit of one of the defendants. The Greenberg Defendants argue that the

Second Amended Complaint and the Transfer Chart do not adequately allege that any of the new transfers were made to or for the benefit of David Greenberg.

The general allegation that all transfers were to or for the benefit of defendants, along with the organization of the Transfer Chart to include transfers received by certain entities under David Greenberg's name, sufficiently pleads that those transfers were for the benefit of David Greenberg.  The Court therefore does not dismiss claims for failure to allege that transfers were made to or for the benefit of David Greenberg.

The Pirtle Defendants similarly argue that there are no allegations of transfers to or for the benefit of Tom Pirtle.  ECF No. 253, at 7-8.  The Transfer Chart lists the "Defendant Name" as "Tom Pirtle and/or Pirtle Investments LP," and shows that Tom Pirtle and/or Pirtle Investments LP received three transfers.  ECF No. 229-1, at 22.  The Pirtle Defendants argue, "The problem is that all three alleged transactions are only allegedly made to Pirtle Investments, LP.  There are no alleged transactions on this exhibit involving Tom Pirtle, individually."  ECF No. 253, at 7.  While two of the transfers are alleged to have been paid to Pirtle Investments LP, one is listed only as "Advance distribution – Midtown Village."  ECF No. 229-1, at 22.  The identification that the transfers were received by "Tom Pirtle and/or Pirtle Investments LP" is sufficient to allege that the transfer was received by or for the benefit of Tom Pirtle.  The Court therefore does not dismiss claims for failure to allege that transfers were made to or for the benefit of Tom Pirtle.

**4.  Preferential Transfers**

The Court dismisses the Trustees' preferential transfer claims as to each of the Movants.  In order to state a claim for a preferential transfer under § 547(b), the Trustees must plead that the transfer of an interest in the Debtors' property was:

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such a transfer was made;

(3) made while the debtor was insolvent;

(4) made—

    (A) within 90 days before the date of the filing of the petition; or

    (B) made within one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that such payment enables such creditor to receive more than such creditor would if—

    (A) the case were a case under Chapter 7 of this title;

    (B) the transfer had not been made; and

    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).  The Debtors' bankruptcy cases were all filed (through involuntary petitions) on September 20, 2007.  The 90-day preference period therefore runs backward to June 22, 2007.  The one-year insider preference period runs backward to September 20, 2006.  Most of the transfers allegedly received by the Movants occurred outside both the 90-day and one-year preference periods.

Against the Sanders Defendants, the Pirtle Defendants, Richard Robert, Tullis Thomas, Alex Oria, James Thomas, Julian Fertitta, and Melisa Thomas, the Trustees allege no transfers within one year.  The alleged transfers therefore could not avoided as preferences even if the recipients were insiders.  The Court therefore dismisses all preferential transfer claims against these Movants.

Against Robert Shiring, Ravi Reddy, the Marquis Defendants, Vincent Galeoto, Mir Azizi, and Warren King, the Trustees allege transfer within the one-year preference period, but not within 90 days of the Debtors' bankruptcy petitions.  The Transfer Chart says "UNKNOWN" in the "Insider" column next to the names of Robert Shiring, Ravi Reddy, Vincent Galeoto, and

Mir Azizi.  This is insufficient, without more, to plead that these defendants were insiders, and the Trustee therefore does not state a claim against these defendants for preferential transfers.

The Transfer Chart has a "YES" in the "Insider" column for Melisa Thomas, Tullis Thomas, the various Marquis Defendants, and Warren King.  The Court therefore examines whether the Second Amended Complaint pleads sufficient facts to support a finding that any of these defendants were insiders.

Under the Bankruptcy Code, the term "insider" includes:

> (A) if the debtor is an individual—
>     (i) relative of the debtor or of a general partner of the debtor;
>     (ii) partnership in which the debtor is a general partner;
>     (iii) general partner of the debtor; or
>     (iv) corporation of which the debtor is a director, officer, or
>         person in control;
> (B) if the debtor is a corporation—
>     (i) director of the debtor;
>     (ii) officer of the debtor;
>     (iii) person in control of the debtor;
>     (iv) partnership in which the debtor is a general partner;
>     (v) general partner of the debtor; or
>     (vi) relative of a general partner, director, officer, or person in
>         control of the debtor;
> (C) if the debtor is a partnership—
>     (i) general partner in the debtor;
>     (ii) relative of a general partner in, general partner of, or
>         person in control of the debtor;
>     (iii) partnership in which the debtor is a general partner;
>     (iv) general partner of the debtor; or
>     (v) person in control of the debtor;
> (D) if the debtor is a municipality, elected official of the debtor or
>     relative of an elected official of the debtor;
> (E) affiliate, or insider of an affiliate as if such affiliate were the
>     debtor; and
> (F) managing agent of the debtor;

11 U.S.C. § 101(A)(31).  An "affiliate" is:

> (A) entity that directly or indirectly owns, controls, or holds with
>     power to vote, 20 percent or more of the outstanding voting

securities of the debtor, other than an entity that holds such securities—

    (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or

    (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote;

(B) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor, other than an entity that holds such securities—

    (i) in a fiduciary or agency capacity without sole discretionary power to vote such securities; or

    (ii) solely to secure a debt, if such entity has not in fact exercised such power to vote;

(C) person whose business is operated under a lease or operating agreement by a debtor, or personal substantially all of whose property is operated under an operating agreement with the debtor; or

(D) entity that operates the business or substantially all of the property of the debtor under a lease or operating agreement

11 U.S.C. § 101(A)(2).  These categories provide general guidance, but are not exclusive:

> Courts regularly treat [section 101(A)'s definition of an "insider"] as illustrative of types of insider relationships and not as an exhaustive list. . . . The insider analysis is a case-by-case decision based on the totality of the circumstances, an bankruptcy courts have used a variety of factors in their determinations.   One approach focuses on the similarity of the alleged insider's position to the enumerated statutory categories, while another approach focuses on the alleged insider's control of the debtor.   If the alleged insider holds a position substantially similar to the position specific in the definition, a court will often find that individual to be an insider.   But, based on the legislative history of the statute, our case law has also held that the term insider can also encompass anyone with a "sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor."

*In re Longview Aluminum, L.L.C.*, 657 F.3d 507, 509 (7th Cir. 2011).

      The Second Amended Complaint alleges that Warren King was a Class B partner of

Juliet.  ECF No. 229, at 11-12.  Although this is insufficient, without more, to plead insider

status, the Second Amended Complaint also alleges that King was the director of Pinnacle Title,

an entity that is alleged to have been actively involved in the Debtors' fraudulent schemes.

According to the Second Amended Complaint, King authorized disbursements of money,

handled all closings for the Debtors, transferred funds from the Debtors' escrow accounts, and

drafted and amended HUD-1 settlement statements.  King's relationship with the Debtors, based

on the Trustees' allegations, may have been "sufficiently close . . . that his conduct [should be]

made subject to closer scrutiny than those dealing at arm's length with the debtor."  *Longview

Aluminum*, 657 F.3d at 509.

Furthermore, the Trustees' allegations that King was an investor in the Debtors' Ponzi

scheme and that he owned a partnership interest in Juliet, combined with the general allegation at

paragraph 147 that "[t]ransfers were made on account of an antecedent debt" are sufficient to

allow an inference that the transfers were on an account of an antecedent debt.[2]  The Trustees

have pleaded sufficient facts to state a preferential transfer claim against King as to the transfers

that were made within one year of the petition date.  The allegation of the amount of the transfer

is enough to support an inference that King received more than he would have received in a

chapter 7 case, if the transfer had not been made, and if he had received payment to the extent

provided by the provisions of the Bankruptcy Code.  The Trustee thus states a § 547 claim

against King.

The Second Amended Complaint also lists Melisa Thomas as a Class B partner of Juliet.

ECF No. 229, at 11.  The Trustees do not plead any other facts that would support an inference

that she was an insider, and therefore they do not state a § 547 claim against Melisa Thomas.

---

[2]  Such a finding may be in the alternative to a finding that the transfers were fraudulent.  The potential
incompatibility of the two theories does not matter at the Rule 12(b)(6) stage; the Court considers only whether both
are plausible.

Tullis Thomas and the various Marquis Defendants are listed as insiders on the Transfer Chart, but the Second Amended Complaint does not contain facts that support this assertion. The Trustees therefore do not state a § 547 claim against Tullis Thomas or the Marquis Defendants.

Finally, the Court examines the allegations against the Greenberg Defendants. The Trustees do not plead that Greenberg & Co. received any transfers within one year of the petitions. They do, however, allege that David Greenberg received several transfers within one year of the petitions, that he received two transfers within 90 days of the petitions, and that he received one post-petition transfer. ECF No. 229-1, at 10. The alleged post-petition transfer is not avoidable under § 547. However, the alleged transfers within one year are avoidable under § 547 if Greenberg was an insider and if the other statutory requirements are met.

The Trustees state a claim as to the two transfers made within 90 days of the petition date. As discussed above, the Trustees plead sufficient facts to give rise to an inference that the transfers were on account of an antecedent debt and that the other elements of a § 547 claim are met. The Trustees thus plead a § 547 preferential transfer claim against Greenberg as to the transfers within 90 days.

As to the transfers between one year and 90 days, the Trustees do not state a claim. The Transfer Chart has a "YES" in the "Insider" column next to Greenberg's name. However, although Greenberg is alleged to have had a Class B partnership interest in Juliet, ECF No. 229, at 11, the Trustees do not plead any other facts giving rise to an inference that he was an insider.

The preferential transfer claims are dismissed as to all defendants except Warren King and David Greenberg. In the Conclusion below, the Court specifically identifies the alleged transfers as to which the Trustees have stated a claim.

**5.  Actual Fraudulent Transfers**

Most of the Movants also argue that the Trustees fail to plead actual fraudulent transfer with particularity.  Claims for actual fraudulent transfer under either § 548 or TUFTA must be pleaded with particularity under Rule 9(b).  *See E. Poultry Distrib., Inc. v. Yarto Puez*, 2001 WL 34664163, at *2 (N.D. Tex. 2001) ("If the fraudulent transfer statute Plaintiffs want the Court to apply requires intent to defraud, the enhanced pleading requirements of Rule 9(b) apply; if the statute allows for fraudulent transfer without intent to defraud, however, only the general pleading rules of Rule 8(a) must be satisfied.").

"To satisfy Rule 9(b)'s particularity requirement, a party must ordinarily allege:  '(1) a the property subject to the transfer, (2) the timing and, if applicable, frequency of the transfer and (3) the consideration paid with respect thereto.'"  *Picard v. Madoff (In re Bernard L. Madoff Inv. Sec. LLC*, --- B.R. ----, 2011 WL 4434632, at *6 (Bankr. S.D.N.Y. Sept. 22, 2011) (quoting *Pereira v. Grecogas Ltd. (In re Saba Enters., Inc.)*, 421 B.R. 626, 640 (Bankr. S.D.N.Y. 2009)).

The Trustees sufficiently plead actual fraudulent transfer.  First, they adequately plead Juliet's fraudulent intent.   It is the transferor's intent that is relevant for an actual fraudulent transfer claim under both § 548 and TUFTA.  *In re Almazan*, 2011 WL 841349, at *2 (Bankr. S.D. Tex. Mar. 7, 2011).  Throughout the Second Amended Complaint, the Trustees extensively allege the existence of a Ponzi scheme, especially at paragraphs 134-136.  ECF No. 229, at 26-27.  As discussed above, the Trustees allege that Juliet had little legitimate business and that investors received a rate of return that was not financially feasible.  ECF No. 229, at 27.  The Trustees also allege that funds received from investors were commingled among the Juliet entities and used, among other things, to pay earlier investors.  ECF No. 229, at 27.  A transferor's actual intent to hinder, delay, or defraud creditors may be inferred from the mere

existence of a Ponzi scheme.  *E.g.*, *S.E.C. v. Resource Development Int'l, LLC*, 487 F.3d 295, 301 (5th Cir. 2007) (noting that, with respect to a TUFTA claim, "[i]n [the Fifth Circuit], proving that IERC operated as a Ponzi scheme establishes the fraudulent intent behind the transfers it made"); *Hayes v. Palm Seedlings Partners (In re Agricultural Research and Tech. Group, Inc.)*, 916 F.2d 528, 535 (9th Cir. 1990) (holding that a debtor's fraudulent intent, for purposes of § 548(a), can be inferred from the existence of a Ponzi scheme).

The Trustees also sufficiently allege that the Ponzi scheme was in existence at the time of each of the alleged transfers to the Movants.  The Second Amended Complaint alleges Ponzi scheme activities, including agreements to provide extravagant guaranteed returns to investors, as early as July 2005.  ECF No. 229, at 16-17.  With a few exceptions, the alleged transfers to the Movants occurred after this time.  One alleged transfer to Warren King, labeled "Partnership Distribution," occurred on December 20, 2004.  ECF No. 229-1, at 23.  An alleged transfer to Alex Oria is labeled "Loan to Alex Oria 12/31/2004 per TMOC Trial balance for client spreadsheet."  ECF No. 229-1, at 2.  Finally, Richard Robert allegedly received transfers on November 29, 2004; December 16, 2004; May 25, 2005; June 10, 2005; and June 27, 2005.  All of the transfers are labeled "Partnership Distribution – Ballpark III."  ECF No. 229-1, at 19.  The Trustees allege that most, if not all, of Juliet's profits from the sale of homes were fictitious and that profit payments to investors thus represented fictitious profits.  This allegation, combined with the agreements to provide allegedly excessive guaranteed returns only months later, would allow an inference that the alleged Ponzi scheme was in existence as early as November 29, 2004.  The Trustees adequately plead actual intent.

Second, the Trustees amply lay out the particulars of each of the alleged transfers.  The Transfer Chart identifies the transferor, recipient, amount, and date of the transfers.  The Transfer

Chart contains commentary as to the circumstances of many of the specific transfers, including, in many cases, the account from which funds were transferred and/or the check number. The exact dates of almost all the transfers are listed. ECF No. 229-1. The Second Amended Complaint provides sufficient context as to the overall scheme. The Court therefore, for the most part, does not dismiss the actual fraudulent transfer claims against the Movants.

There is one exception. As to Shreyaskumar Patel, the Transfer Chart does not identify any specific transfer. The Transfer Chart instead states that the "Date of Transfer" is "Various" and the "Amount" is "$285,000.00." The "Capacity of Transfer(s)" is "Juliet Homes, LP buyout documentation." This information is not sufficiently specific. The Transfer Chart does not even identify the year in which the alleged transfer or transfers occurred. The Court will allow the Trustee to replead to state a claim for actual fraudulent transfer against Shreyaskumar Patel. *See Hart v. Bayer Corp.*, 199 F.3d 239, 248 n.6 (5th Cir. 2000) ("Although a court may dismiss the claim, it should not do so without granting leave to amend, unless the defect is simply incurable or the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so.").

## 6. Constructive Fraudulent Transfers

The Movants also argue that the Trustees' constructive fraudulent transfer claims under § 548 and TUFTA fail because they do not adequately plead insolvency or lack of reasonably equivalent value. This argument fails. First, the Trustees adequately plead insolvency because they adequately plead that Juliet operated as a Ponzi scheme. *See Madoff*, 2011 WL 4434632, at *17 ("Ponzi schemes are presumptively insolvent, and the Trustee need not allege specific facts supporting the insolvency of BLMIS at the times of the preferential transfers.").

22 / 33

Second, "fictitious profits from a Ponzi scheme are deemed to have been received for less than reasonably equivalent value and can be avoided." *Id.* at *11. The Trustees adequately plead that the transfers shown on the Transfer Chart were made as part of Juliet's overall Ponzi scheme. It was not necessary for the Trustees to plead that each individual transfer was made without reasonably equivalent value. The Court therefore does not dismiss the constructive fraudulent transfer claims.

### 7. Conversion/Misappropriation/Unjust Enrichment

The Movants also argue that the Trustees do not adequately plead the elements of conversion, misappropriation, or unjust enrichment and that the statute of limitations has run as to these claims.

The Trustees may commence actions to enforce claims owned by the estates up to two years after the date of the order for relief, which was October 31, 2007:

> If applicable nonbankruptcy law . . . fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of—
> > (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or
> > (2) two years after the order for relief.

11 U.S.C. § 108(a). The Debtors' petitions were filed on September 20, 2007, and the order for relief was entered on October 31, 2007. With respect to any claims relating to pre-petition conduct, the later of the two periods under § 108(a) would necessarily be two years after the order for relief. The Trustee brought the unjust enrichment claim on October 29, 2009, within the two-year period under § 108(a)(2). The conversion and misappropriation claims relate back to the date of the original complaint. ECF No. 213, at 32 ("The conversion, misappropriation, and unjust enrichment theories are all based on the allegation that Juliet's investors received

assets that should have remained in the bankruptcy estate.  The claim therefore relates back under Rule 15(c)(1)(B).").  The question, therefore, is whether the limitations period on the claims had not yet expired on September 20, 2007, the date the petitions were filed.

Under Tex. Civ. Prac. & Rem. Code § 16.003(a), "a person must bring suit for . . . conversion . . . not later than two years after the day the cause of action accrues."  The statute of limitations for conversion also applies to unjust enrichment and misappropriation claims. *Verizon Emp. Benefits Comm. v. Frawley*, 655 F. Supp. 644, 647-48 (N.D. Tex. 2008); *Elledge v. Friberg-Cooper Water Supply Corp.*, 240 S.W.3d 869, 869-71 (Tex. 2007); *see Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996) (noting that § 16.003(a) governs claims for "injury to the property of another or conversion of the property of another" and applying the two-year limitations period to a claim for misappropriation of trade secrets).

Two doctrines may apply to extend the statute of limitations:  the discovery rule and the fraudulent concealment doctrine.  *BP America Prod. Co. v. Marshall*, 342 S.W.3d 59, 65-67 (Tex. 2011).  The discovery rule defers the accrual of a cause of action and thus delays the start of the limitations period.  *Id.* at 65.  "The discovery rule is applied categorically to instances in which 'the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable.'"  *Id.* (quoting *Computer Assoc. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 456 (Tex.1996)).

The fraudulent concealment doctrine, on the other hand, suspends or tolls the running of the limitations period when it has already begun.  *Id.*  "A party asserting fraudulent concealment must establish an underlying wrong, and that 'the defendant actually knew the plaintiff was in fact wronged, and concealed that fact to deceive the plaintiff.'"  *Id.* at 67 (quoting *Earle v. Ratliff*,

998 S.W.2d 882, 888 (Tex.1999)).  Fraudulent concealment tolls the running of limitations only until the fraud is discovered or could have been discovered with reasonable diligence.  *Id.*

Claims may be dismissed on the basis of the statute of limitations only if the limitations defense is apparent from the face of the complaint.  *See EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, NA*, 467 F.3d 466, 470 (5th Cir. 2006) (allowing dismissal at the Rule 12(b)(6) stage on the basis of an affirmative defense when the defense is apparent from the face of the complaint).  The Trustees plead facts that indicate that the fraudulent concealment doctrine may apply to toll the statute of limitations.  They allege the existence of an overall Ponzi scheme, the commingling of funds of the various Juliet entities, the use of a shell company (TMOC) to divert funds among the entities and to various investors, and the execution of phony agreements and invoices.  The Trustee has therefore alleged concealment of facts about the scheme and has provided additional allegations that allow an inference of concealment.  Because the fraudulent concealment doctrine may apply, it is not apparent from the face of the complaint that any of the conversion, misappropriation, and unjust enrichment claims are barred by limitations.

Courts have applied the discovery rule to bankruptcy trustees, tolling statutes of limitations until the filing of a bankruptcy petition:

> Although the Trustee steps into the shoes of the [bankrupt] company, it is not in a position, prior to the filing of the bankruptcy action, to be aware of potential claims arising from injuries to the bankrupt company.  A reasonable person in the Trustee's position could not be aware of, or reasonably be expected to discover, injuries to [the debtor] prior to the filing of the bankruptcy petition.  Therefore, the discovery rule applies to toll the statute of limitations until the filing of the bankruptcy petition[.]

*Seitz v. Detweiler, Hershey & Assocs., P.C. (In re CitX Corp., Inc.)*, 2004 WL 2850046 (E.D. Pa. Dec. 8, 2004) (applying the Pennsylvania-law discovery rule to a bankruptcy trustee and

concluding that because the trustee had filed malpractice and negligent misrepresentation claims within two years of the bankruptcy petition, claims were not barred by the statute of limitations).

The *Seitz* court's reasoning extends to applying the Texas-law fraudulent concealment doctrine to bankruptcy trustees. Tolling the statute of limitations until the petition date or until the bankruptcy trustee could reasonably have discovered the cause of action would also be compatible with the Fifth Circuit's reasoning in *Reed v. City of Arlington*, 650 F.3d 571, 576 (5th Cir. 2011). In *Reed*, the Fifth Circuit held that even when a debtor would be barred by judicial estoppel from bringing a claim, the bankruptcy trustee may—depending on the facts of the case—be able to bring the claim on behalf of the bankruptcy estate. *Id.* This is because "judicial estoppel is an equitable doctrine, [and] courts may apply it flexibly to achieve substantial justice." *Id.* The fraudulent concealment doctrine, like judicial estoppel, is an equitable doctrine, and its application is fact-specific. *BP America Prod.*, 342 S.W.3d at 67.

The nature of the Trustees' allegations—that the Juliet Debtors operated a Ponzi scheme and fraudulently diverted money—indicates that the fraudulent concealment doctrine may apply. It is not apparent from other facts on the face of the Second Amended Complaint that the fraudulent concealment doctrine would not permit the tolling of the statute of limitations on the conversion, misappropriation, and unjust enrichment claims. Although the Court has already found that the Trustees did not exercise sufficient diligence after the filing of the bankruptcy petitions to warrant equitable tolling in this case, this finding applied only to prevent tolling after the Trustees' appointment, after which time they could reasonably have discovered claims. The Court's previous finding does not preclude the application of the fraudulent concealment doctrine to toll the limitations period until after the petition date. If the limitations period may be tolled until after the petition date, then the claims were live when the bankruptcy cases were

filed, and the Trustees had until October 31, 2009 to assert the claims.  As the Court has already

held, the conversion, misappropriation, and unjust enrichment claims were asserted in or relate

back to the October 29, 2009 original complaint.

Because the fraudulent concealment doctrine may apply and the claims should not be

dismissed on the basis of limitations, the Court need not consider whether the discovery rule

could also apply to these claims.

Of course, the concealment issue may be the appropriate subject of a motion for summary

judgment or at trial, once an evidentiary record is established.

Furthermore, as to any alleged transfers that occurred less than two years before the

petition date, the conversion, misappropriation, and unjust enrichment claims were clearly live

on the petition date and have been timely asserted.  The Court therefore does not dismiss the

conversion, misappropriation, and unjust enrichment claims on the basis of limitations.

The Court also finds that these claims are adequately pleaded.  To prove conversion, a

plaintiff must establish (i) that it owned or had legal possession of the property or entitlement to

possession, and (ii) the defendant unlawfully and without authorization assumed and exercised

dominion and control over the property to the exclusion or, or inconsistent with, the plaintiff's

rights.  *Hill v. New Concept Energy, Inc. (In re Yazoo Pipeline)*, --- B.R. ----, 2011 WL 4902960,

at *11-12 (Bankr. S.D. Tex. 2011) (quoting *Hunt v. Baldwin*, 68 S.W. 3d 117, 131 (Tex. App.—

Houston [14th Dist.] 2001, no pet.).  If conversion is to be shown by the defendant's refusal to

comply with the demand for possession—for example, in situations of conversion by a bailee—

the plaintiff must also establish (iii) that the plaintiff demanded return of the property, and (iv)

the defendant refused to return the property.  *Id.* (citing *Presley v. Cooper*, 284 S.W.2d 138, 141

(Tex. 1955)).   Here, demand and refusal would not be necessary to establish unlawful

possession; the Trustees allege that the defendants acquired possession of the Debtors' property unlawfully, through diversions of funds.

The Trustees plead both that (i) that the Debtors were lawfully entitled to possession of the transferred funds and (ii) that the defendants unlawfully exercised dominion and control over the property.  The Trustees specifically allege, for example, that the transferred funds were the property of the Debtors, acquired from other investors.  ECF No. 229, at 18-19.  The funds were allegedly commingled, rendering them untraceable, and diverted to various defendants.  ECF No. 229, at 19.  The Trustees also allege that "[m]illions of dollars were paid out of Juliet and TMOC to individuals, affiliate entities, and 'preferred investors,' while many subcontractors and vendors remained unpaid for the work performed on the residences constructed for Juliet."  ECF No. 229, at 23.  These allegations, particularly in the context of the alleged overall Ponzi scheme, sufficiently plead both the Debtor's lawful entitlement to the funds and the defendants' unlawful dominion over the funds.

Moreover, the Court notes that the Trustees need not establish wrongful intent to prove conversion.  "Wrongful intent is not an element of conversion—even innocent buyers of property may be liable."  *NXCESS Motor Cars, Inc. v. JPMorgan Chase Bank, N.A.*, 317 S.W.3d 462, 471 (Tex. App.—Houston [1st Dist] 2010, pet. denied).  "The requisite intent is only one to assert a right in the property, and a wrongful intent is not required."  *White-Sellie's Jewelry Co. v. Goodyear Tire & Rubber Co.*, 477 S.W.2d 658, 662 (Tex. Civ. App.—Houston [14th] Dist. 1972, no writ).  The intent to assert a right in the transferred property may be inferred from the facts alleged in the Second Amended Complaint.  The Trustees therefore have pleaded conversion, and the Court does not dismiss the conversion claims.

The Trustees have also pleaded an alternative theory of "misappropriation or unjust enrichment." ECF No. 229, at 37. The "misappropriation or unjust enrichment" theory is discussed in paragraph 185 of the Second Amended Complaint, and the Court construes this theory as an unjust enrichment cause of action. Unjust enrichment is based on the equitable principle that one who receives benefits unjustly must make restitution for those benefits. *Cristobal v. Allen*, 2010 WL 2873502, at *6 (Tex. App.—Houston [1st Dist.] July 22, 2010, no pet.). "Unjust enrichment is defined as the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Conoco, Inc. v. Fortune Prod. Co.*, 35 S.W.3d 23, 31 (Tex. App.—Houston [1st Dist.] 1998), *rev'd on other grounds*, 52 S.W.3d 671 (Tex. 2000). As discussed in connection with the conversion claims, the Trustees have pleaded that the defendants received property to the loss of the Debtors. The consequence of the alleged loss is that the Trustees should be able to seek recovery to promote an overall equitable division of the estate. *See Reed*, 650 F.3d at 575 ("All of these provisions reflect Congress's clear preference for the preservation of the bankruptcy estate and for its equitable distribution to creditors through the bankruptcy process."). The Court does not dismiss the unjust enrichment claims.

## 8. Substantive Consolidation/Reverse Veil-Piercing

Several Movants also argue that the Trustees may not assert claims for transfers that were made from non-debtor Juliet entities. *E.g.*, ECF No. 253, at 8; ECF No. 262, at 5-6; ECF No. 276, at 10-13. Fertitta specifically argues that, in order to state a claim for preferential or fraudulent transfer from a particular entity, the Trustees must show that that entity should be substantively consolidated under bankruptcy law with one or more of the Debtors. ECF No. 278, at 6-7.

The Trustees do not need to plead substantive consolidation. Instead, if the Trustees have stated a state-law claim for reverse veil-piercing with respect to the Juliet entities, the Trustees have standing to assert a fraudulent or preferential transfer claim because of a transfer made from the Juliet entities. *See ASARCO LLC v. Americas Min. Corp.*, 382 B.R. 49, 66-67 (S.D. Tex. 2007) (recognizing that substantive consolidation and veil-piercing are subtly different and allowing the debtor to pursue its wholly owned subsidiary's fraudulent transfer claim "where the wholly-owned subsidiary acts as a mere instrumentality or alter ego of the parent"). Although *ASARCO* applied Delaware law of veil-piercing, the court's holding—that a debtor can pursue its wholly owned subsidiary's fraudulent transfer claim where state-law veil-piercing requirements are met—applies.

Here, the Trustees have pleaded the elements of a reverse veil-piercing claim under Texas law. Traditional veil-piercing uses the alter ego doctrine to break through corporate formalities and include the assets of a shareholder as assets of a corporation. *See* Tex. Bus. Org. Code § 21.223(b) (requiring actual fraud to hold a shareholder liable for the contractual obligations of a corporation); *The Cadle Co. v. Brunswick Homes, LLC (In re Moore)*, 379 B.R. 284, 290 (Bankr. N.D. Tex. 2007) (discussing the traditional use of corporate veil piercing to "mak[e] a *shareholder* liable for a *corporation's* contractual debts"). Reverse veil-piercing, which is a common-law rather than a statutory doctrine in Texas, instead counts the assets of a corporation or other entity as the assets of its shareholder. *See Moore* (noting that reverse veil-piercing "appl[ies] the traditional veil piercing doctrine in reverse, so that a *corporation's* assets are held accountable for the liabilities of *individuals* who treated the corporation as their alter ego") (citing *Zahra Spiritual Trust v. United States*, 910 F.2d 240, 243 (5th Cir. 1990)).

Reverse veil-piercing can be used to bring assets of an affiliated entity into a bankruptcy estate, although the court in *Moore* was "troubled" by the expansion of the practice. *Id.* at 294. The doctrine applies when the corporate entity is the alter ego of the individual—that is, "when there is such a unity between corporation and individual that the separateness of the corporation has ceased and holding only the individual liable would result in injustice." *Bollore S.A. v. Import Warehouse, Inc.*, 448 F.3d 317, 325 (5th Cir. 2006) (stating the standard for alter-ego liability and noting that the "standard applies equally to reverse-piercing cases such as this one"). To determine whether the alter ego doctrine applies, a court considers the following factors:

> the total dealings of the corporation and the individual, including the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes.

*Id.* (citing *Permiam Petroleum Co. v. Petroleos Mexicanos*, 934 F.2d 635, 643 (5th Cir 1991)).

Here, the Trustees seek to count the assets of non-debtor Juliet entities as assets of the Debtors (the shareholder/interest holder). The Trustees allege that the non-debtor Juliet entities should be pierced or recognized as collapsed because they are alter egos of the Debtors and/or were used as a sham to perpetrate a fraud on the estates. ECF No. 229, at 34. The Trustees allege specific facts showing an identity or unity between the Debtors and the other Juliet entities, including:

- The entities were organized and operated as a mere tool or business conduit of the Debtors. ECF No. 229, at 34.

- The entities were run by and for the personal benefit of the Debtors and were the agents and instrumentalities through which the Debtors conducted business. ECF No. 229, at 35.

- The entities commingled funds in the TMOC account, diverted company profits to Brown and other insiders, were

undercapitalized, and failed to keep corporate and personal assets separate.  ECF No. 229, at 35.

- To perpetrate fraud, Brown had corporate revenues siphoned off, depleting the remaining shareholder equity and ultimately rendering Juliet insolvent.  ECF No. 229, at 35.

To summarize, the Trustees allege that the entities were a sham and were not truly separate from the Debtors, and that the sham entities were specifically used to facilitate the fraudulent diversion of assets.  These allegations thus adequately state a claim for reverse veil-piercing under Texas law.

The Greenberg Defendants argue that the Trustees' veil-piercing allegations are insufficient because all of the Juliet entities are lumped together.  ECF No. 276, at 11-12. However, the Trustees assert that all of the entities were similarly involved in the alleged Ponzi scheme, and that all were mere conduits for the Debtors.  In the context of the alleged Ponzi scheme, the Trustees plausibly plead reverse veil-piercing as to the non-debtor Juliet entities.

The Court therefore does not dismiss any claims on the basis of the Trustees' failure to plead substantive consolidation or failure to adequately plead reverse veil-piercing.

**Conclusion**

The Court denies the Greenberg Defendants' motion to strike and the Pirtle Defendants' motion to strike.

Except as to the actual fraudulent transfer claim against Shreyaskumar Patel, the Court denies the Movants' motions for a more definite statement.

The Court grants, in part, and denies, in part, the Movants' motions to dismiss for failure to state a claim.

The Court dismisses the preferential transfer claims against all of the Movants except Warren King and David Greenberg.  As to Warren King, the Trustees have stated a claim for

preferential transfer with respect to the December 13, 2006 transfer of $58,610.63.  As to David Greenberg, the Trustees have stated a claim for preferential transfer with respect to the June 22, 2007 transfer and the August 10, 2007 transfer.

The Court does not dismiss the actual fraudulent transfer claims for failure to plead with particularity under Rule 9(b).  However, the Trustees do not state a claim with particularity against Shreyaskumar Patel, and the Court will allow the Trustees to replead.  The Trustees state an actual fraudulent transfer claim with particularity against all other Movants.

The Court does not dismiss the conversion/misappropriation/unjust enrichment claims against any Movants.

SIGNED **December 28, 2011.**

Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE