

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ENTERED
10/17/2013

| | | |
|---|---|---|
| IN RE: | § | |
| JULIET HOMES, LP | § | CASE NO: 07-36424 |
|     Debtor(s) | § | |
| | § | CHAPTER 7 |
| | § | |
| JOSEPH M HILL, *et al* | § | |
|     Plaintiff(s) | § | |
| | § | |
| VS. | § | ADVERSARY NO. 09-03429 |
| | § | |
| ALEX ORIA, *et al* | § | |
|     Defendant(s) | § | |

## MEMORANDUM OPINION

The Motion for Summary Judgment filed by Marquis Capital II Westcott, LP, Marquis Capital II, LLC, Michael Ecklund, and William Marsh Resco I, LP (ECF No. 443), is granted, in part, and denied, in part. The Motion for Summary Judgment filed by Vincent Galeoto (ECF No. 444), is denied. The Motion for Summary Judgment filed by James Crable (Case No. 09-03435, ECF No. 57) is granted, in part, and denied, in part.

### Background

A complete history of this adversary proceeding is in this Court's prior Memorandum Opinions, ECF Nos. 213 & 291.

This Memorandum Opinion concerns Motions for Summary Judgment filed by: (1) Marquis Capital II Westcott, LP, Marquis Capital II, LLC, Michael Ecklund, William Marsh Resco I, LP (ECF No. 443); (2) Vincent Galeoto (ECF No. 444); and (3) James Crable (Case No. 09-03435, ECF No. 57).

The Trustees' Second Amended Complaint sought judgment against the Movants for: (1) receiving preferential transfers under 11 U.S.C. § 547; (2) receiving fraudulent transfers under 11

U.S.C. § 548; (3) receiving fraudulent transfers under the Texas Uniform Fraudulent Transfer Act; (3) conversion, misappropriation of assets and, unjust enrichment; (4) punitive damages; and (5) legal fees and costs.

On July 20, 2011, the Marquis Defendants and Mr. Galeoto filed Motions to Dismiss the Trustees' Second Amended Complaint. ECF Nos. 261 & 266. The Court dismissed the § 547 preferential transfer claims against the Marquis Defendants and Mr. Galeoto. ECF No. 291. Mr. Crable did not file a motion to dismiss and therefore the Court's dismissal of the § 547 claims in its December 28, 2011 Opinion was not applicable to Mr. Crable. All other causes of action remain.

**William Marsh Resco**

Mr. Ecklund was the manager of William Marsh Resco I and Marquis Capital II Westcott. ECF No. 443 at 3. Resco invested $125,000.00 in the Rescon Group via check on September 9, 2005. ECF No. 443 at 4. The Trustees allege that at the time of Resco's investment, Rescon was an insolvent and unprofitable venture. ECF No. 454 at 4. Rescon's financial statements as of September 20, 2005, reflected a loss of $1,879,082.00 and negative equity of $1,069,082.00. ECF No. 454 at 4. On February 23, 2006, despite Rescon's insolvency, Juliet entered an agreement to purchase Resco's interest for $142,284.00. ECF No. 454 at 5. Resco disputes having received this $142,284.00. ECF No. 454 at 5.

The Trustees seek recovery of the following transfers from Resco:

- $50,000.00 check issued March 1, 2007 for Partnership Distribution. ECF No. 110-3 at 19.

- $10,000.00 check issued March 9, 2007 for Partnership Distribution. ECF No. 110-3 at 19.

Resco asserts that the $50,000.00 check issued on March 1 was returned for insufficient funds. ECF No. 443 at 5.

**Marquis Capital Westcott**

On May 18, 2005, Marquis Capital II Westcott made a $250,000.00 investment in Juliet Westcott II, LP—a joint venture with Juliet Homes-Westcott II, LLC. ECF No. 443 at 5. Under the terms of the Westcott Joint Venture Agreement, Marquis Westcott contributed $250,000.00 for the purpose of developing eleven homes for resale. ECF No. 454 at 3. Marquis Westcott was to receive 1/11th of its initial investment as each home was sold, and thereafter the profits would be split seventy-five percent to Juliet and twenty-five percent to Marquis Westcott. ECF No. 454 at 3. The Joint Venture Agreement provided that Marquis Westcott would receive a guaranteed minimum return on its investment of $100,000.00, or thirty-five percent. ECF No. 454 at 3. Juliet defaulted on the Joint Venture Agreement and failed to pay Marquis Westcott the required capital returns. ECF No. 454 at 4. However on February 14, 2006, Marquis Westcott received a $50,000.00 payment from Juliet as a partnership distribution. ECF No. 454 at 4. On May 1 and May 11, 2006, Marquis Westcott received payments of $75,000.00 and $50,000.00, respectively, as distributions from its Westcott investment. ECF No. 454 at 5. The Trustees seek recovery of the following transfers from Marquis Westcott:

- $50,000.00 check issued March 1, 2007 for Partnership Distribution. ECF No. 110-2 at 11.
- $10,000.00 check issued March 9, 2007 for Partnership Distribution. ECF No. 110-2 at 11.

Marquis Westcott asserts that the $50,000.00 check issued on March 1, was returned for insufficient funds. ECF No. 443 at 6.

**Ecklund & Crable Model Home Investment**

Mr. Ecklund, individually, and his partner, Mr. Crable, purchased a townhome in Juliet's Westcott development for $216,197.00. ECF No. 443 at 6. Mr. Ecklund and Mr. Crable each paid fifty percent of the purchase price. ECF No. 443 at 6. Mr. Ecklund and Mr. Crable leased the

Westcott Townhome back to Juliet to use as a model home for $2,245.24 per month. ECF No. 43 at 6. After one year, Mr. Ecklund and Mr. Crable sold the Westcott Townhome to a third party for $224,000.00. ECF No. 443 at 7. As part of the agreement, Juliet covered the closing costs and also paid Mr. Ecklund and Mr. Crable an additional $7,000.00 at closing. ECF No. 443 at 7. Mr. Ecklund and Mr. Crable allege that this $7,000.00 included three months of back rent, and damage to the Westcott Townhome that Juliet had failed to repair during its use as a model home. ECF No. 443.

The Trustees seek recovery of the following transfers from Mr. Ecklund:

- $13,471.44 in rent for the Westcott Townhome from January through December 2006. ECF No. 110-2 at 13-14.

- $50,000.00 check issued February 14, 2006, paid to Marquis Capital. ECF No. 110-2 at 14.

- $75,000.00 check issued May 1, 2006, paid to Marquis Westcott for Return of Capital. ECF No. 110-2 at 14.

The Trustees seek recovery of the following transfers from Mr. Crable:

- $13,471.44 in rent for the Westcott Townhome from January through December 2006. ECF No. 112-1 at 11.

The Marquis Defendants and Mr. Crable filed counterclaims for their legal fees and costs under Tex. Bus. & Com. Code § 24.013. ECF No. 443 at 13; Case No. 09-03435, ECF No. 57 at 11. They assert that they should be awarded fees and costs because they were required to defend the baseless claims asserted against them by the Trustees. ECF No. 443 at 13; Case No. 09-03435, ECF No. 57 at 11.

**Vincent Galeoto**

On July 26, 2004, Mr. Galeoto invested $162,500.00 with Juliet through the Janvin Corporation for the purpose of building twenty-four homes under the Juliet-Ballpark V Joint Venture

Agreement.[1]  ECF No. 455 at 3.  According to the Ballpark Joint Venture Agreement, Janvin was entitled to the return of 1/24th of Mr. Galeoto's capital as each home was sold, with Juliet's out of pocket expenses to be reimbursed after Mr. Galeoto was paid.  ECF No. 455 at 3.  Janvin was then to receive ten percent of any profits after Juliet's reimbursement.  ECF No. 455 at 3.  Because no homes were built, Janvin was not entitled to receive any funds under the Joint Venture Agreement.  ECF No. 455 at 3.  However on January 31, 2006, Janvin signed a Buyout Agreement for its interest under the Ballpark Joint Venture Agreement and received $325,000.00 for its interest.  ECF No. 455 at 3.  Pursuant to the Buyout Agreement, Juliet paid Janvin $125,000.00 on January 31, 2006, $100,000.00 on February 28, 2006, $100,000.00 on March 31, 2006, and $100,000.00 on February 19, 2007.  ECF No. 455 at 3.

On June 28, 2006, Mr. Galeoto loaned Juliet $250,000.00 under a secured promissory note with a maturity date of December 28, 2007.  ECF No. 455 at 3.  Mr. Galeoto believes he may have several causes of action against Juliet in connection with the loan, and filed a proof of claim in Juliet's bankruptcy on August 1, 2008.  ECF No. 455 at 3-4.

The Trustees seek recovery of the following transfers from Mr. Galeoto:

- $125,000.00 check issued January 1, 2006 to Janvin for Galeoto Buyout—per buyout agreement.  ECF No. 110-3 at 16.

- $100,000.00 check issued May 31, 2006 to Janvin for Galeoto Buyout—per buyout agreement.  ECF No. 110-3 at 16.

- $100,000.00 check issued February 19, 2007 for Partnership Distribution.  ECF No. 110-3 at 16.

### Summary Judgment Standard

---

[1] Although Mr. Galeoto, individually, was not a party to the Ballpark Joint Venture Agreement, the checks that Juliet paid out per the Agreement were issued both to Janvin and Mr. Galeoto. Because these checks were issued to Mr. Galeoto as a joint payee, the Trustee is seeking to recover the transfers from him.

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Fed. R. Bankr. P. 7056 incorporates Rule 56 in adversary proceedings.

A party seeking summary judgment must demonstrate: (i) an absence of evidence to support the non-moving party's claims or (ii) an absence of a genuine dispute of material fact. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Warfield v. Byron*, 436 F.3d 551, 557 (5th Cir. 2006). A genuine dispute of material fact is one that could affect the outcome of the action or allow a reasonable fact finder to find in favor of the non-moving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

A court views the facts and evidence in the light most favorable to the non-moving party at all times. *Campo v. Allstate Ins. Co.*, 562 F.3d 751, 754 (5th Cir. 2009). Nevertheless, the Court is not obligated to search the record for the non-moving party's evidence. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record, showing that the materials cited do not establish the absence or presence of a genuine dispute, or showing that an adverse party cannot produce admissible evidence to support the fact.[2] Fed. R. Civ. P. 56(c)(1). The Court need consider only the cited materials, but it may consider other materials in the record. Fed. R. Civ. P. 56(c)(3). The Court should not weigh the evidence. A credibility determination may not be part of the summary judgment analysis. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007). However, a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. Fed. R. Civ. P. 56(c)(2).

---

[2] If a party fails to support an assertion or to address another party's assertion as required by Rule 56(c), the Court may (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if, taking the undisputed facts into account, the movant is entitled to it; or (4) issue any other appropriate order. Fed. R. Civ. P. 56(e).

"The moving party bears the burden of establishing that there are no genuine issues of material fact." *Norwegian Bulk Transp. A/S v. Int'l Marine Terminals P'ship*, 520 F.3d 409, 412 (5th Cir. 2008). The evidentiary support needed to meet the initial summary judgment burden depends on whether the movant bears the ultimate burden of proof at trial.

If the movant bears the burden of proof on an issue, a successful motion must present evidence that would entitle the movant to judgment at trial. *Malacara*, 353 F.3d at 403. Upon an adequate showing, the burden shifts to the non-moving party to establish a genuine dispute of material fact. *Sossamon*, 560 F.3d at 326. The non-moving party must cite to specific evidence demonstrating a genuine dispute. Fed. R. Civ. P. 56(c)(1); *Celotex Corp. v. Cattrett*, 477 U.S. 317, 324 (1986). The non-moving party must also "articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004). Even if the movant meets the initial burden, the motion should be granted only if the non-movant cannot show a genuine dispute of material fact.

If the non-movant bears the burden of proof of an issue, the movant must show the absence of sufficient evidence to support an essential element of the non-movant's claim. *Norwegian Bulk Transp. A/S*, 520 F.3d at 412. Upon an adequate showing of insufficient evidence, the non-movant must respond with sufficient evidence to support the challenged element of its case. *Celotex*, 477 U.S. at 324. The motion should be granted only if the non-movant cannot produce evidence to support an essential element of its claim. *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

### Analysis

**Fraudulent Transfers**

11 U.S.C. § 548(a)(1) provides in pertinent part that:

> The trustee may avoid any transfer…of an interest of the debtor in property, or any obligation…incurred by the debtor, that was made or

> incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or
>
> (B) (i) received less than reasonably equivalent value in exchange for such transfer or obligation; and
>
>> (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>>
>> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>>
>> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
>>
>> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

The Trustees have demonstrated that a genuine fact issue exists both as to whether the relevant transactions were actual fraudulent transfers under § 548(a)(1)(A), or constructive fraudulent transfers under § 548(a)(1)(B).

A Ponzi scheme is one in which a corporation operates and continues to operate at a loss. *Janvey v. Alguire*, 647 F.3d 585, 597 (5th Cir. 2011). The corporation gives the appearance of profitability by using new investments to pay for high premiums promised to earlier investors. *Id*. The effect of a Ponzi scheme is to put the corporation further and further into debt by incurring more liability, while giving the corporation a false appearance of profitability in order to obtain new investors. *Id*.

Establishing that a debtor operated a Ponzi scheme establishes the actual fraudulent intent of a transfer. *Warfield v. Byron*, 436 F.3d 551, 558 (5th Cir. 2006). Additionally, a Ponzi scheme is, as a matter of law, insolvent from inception. *Janvey, et al. v. Democratic Senatorial Campaign Committee, et al.*, 712 F.3d 185, 196 (2013).

According to the deposition testimony of Juliet's CFO, Ray Lindgren, the returns Juliet paid to its investors were imprudent and unsustainable long term. ECF No. 454-1 at 33-36. He testified that the only benefit to Juliet from making these payments to investors was to entice further investment. ECF No. 454-1 at 38. Lindgren stated that with the 100 percent returns on investment that Juliet paid to its investors, it would be impossible for a homebuilder to operate profitably. ECF No. 454-1 at 24. To perpetuate the Ponzi scheme, Juliet's principal, Doug Brown, commingled investor proceeds using an administrative entity called The Market on Congress. ECF No. 454-1 at 9-11. Mr. Brown personally exercised oversight over this commingled pool of assets and used it to pay Juliet's investors. ECF No. 454-1 at 19. Juliet's equity became negative in 2004, and Juliet incurred losses all throughout 2005. ECF No. 454-1 at 41-44. Juliet's operations generated negative cash flow throughout 2005, and the company was only propped up by financing. ECF No. 454-1 at 44. Mr. Brown forced his assistant to change Juliet's financial statements from showing losses to profits while Mr. Lindgren was on vacation, and distributed the falsified financials to Juliet's bank. ECF No. 454-1 at 49-51. When Mr. Brown was asked at his deposition whether the transfers that are the subject of this litigation were made with the intent to hinder, delay, or defraud Juliet's future creditors, Mr. Brown invoked his Fifth Amendment right. ECF No. 454-3 at 7.

These facts present a genuine issue as to whether: (1) Juliet operated as a Ponzi scheme; (2) Juliet made the relevant transfers with the intent to hinder, delay or defraud its creditors; and (3) Juliet was insolvent at the time of the relevant transactions. If Juliet, in fact, operated as a Ponzi scheme, the Trustees may succeed on their claims for actual fraudulent transfers under

§ 548(a)(1)(A) because the operation of a Ponzi scheme by a debtor establishes a debtor's actual fraudulent intent.

Under § 548(a)(1), a trustee may recover the full amount paid to a Ponzi scheme investor unless the investor can show that it received the payments from the scheme for value and in good faith. *In re Lake States Commodities*, 253 B.R. at 877-878. There is case law to suggest that a Ponzi scheme investor is entitled to recover the principal, but not the interest on his or her investment. *See, e.g., Fisher v. Sellis (In re Lake States Commodities, Inc.)*, 253 B.R. 866, 871 (Bankr. N.D. Ill. 2009) (amount a Ponzi scheme investor receives up to amount invested is considered a transfer for value). The Court makes no determination today as to whether the Movants may, in fact, recover up to the amount of their initial investments because, as a threshold matter, there is a genuine dispute of fact as to whether the relevant transfers were received in good faith. If the transfers were not received in good faith, the transferees are not entitled to retain any of the amounts received by them in furtherance of the scheme.

The Code does not define good faith, but the case law construes good faith as having an objective component. *Id*. at 878. Facts placing a reasonable person on inquiry notice of the debtor's financial condition, or on inquiry notice that the debtor operated with a fraudulent purpose, deprive a defendant of a good faith defense. *Id*. at 878. In Ponzi scheme cases, if the circumstances would place a reasonable person on inquiry notice of the debtor's fraudulent purpose, and if a diligent inquiry would have revealed the fraudulent purpose, the challenged transfer is fraudulent. *Id*. Relevant factors to an inquiry of good faith are whether the defendant is an experienced investor, whether the rates of return promised by the debtor greatly exceed market rates, whether the debtor provided implausible explanations as to how it would pay the high rates of return, and factors that would indicate insolvency. *Id*.

The Trustees have shown that there is a genuine issue of fact as to whether the Movants acted in good faith. Marquis Westcott was guaranteed a minimum thirty-five percent rate of return on its

investment in the Westcott Joint Venture Agreement. Subsequent to and in spite of defaulting on the Westcott Joint Venture Agreement, Juliet paid Marquis Westcott several partnership distributions. At the time that Resco invested in Rescon, Rescon was operating at a loss and had negative equity. Despite Rescon's insolvency, Juliet entered an agreement to purchase Resco's interest in the venture for $142,284.00. Both Resco and Marquis Westcott assert that checks paid to them were returned for insufficient funds. Although no homes were built under the Ballpark Joint Venture Agreement, Mr. Galeoto, through Janvin, received $325,000.00 for his interest in the Joint Venture Agreement. Mr. Ecklund and Mr. Crable allege that the $7,000.00 that Juliet paid to them at the closing of the Townhome was in part to satisfy three months of back rent. All of these facts tend to show that the Movants were put on inquiry notice of Juliet's insolvency and fraudulent purpose. Because there are several disputed issues of fact relevant to the Trustees' § 548(a)(1) claims, summary judgment is denied.

Summary judgment is denied with respect to the Trustees' TUFTA claims for the same reasons that it is denied for the claims under § 548(a)(1).

**Conversion/ Misappropriation/ Unjust Enrichment**

The Court's memorandum opinion issued December 28, 2011 (ECF No. 291), enumerated the standard for the Trustees' claims for conversion, misappropriation and unjust enrichment. Summary judgment is denied with respect to these claims because at least one genuine issue of material fact exists.

### Conversion

To prove conversion, a plaintiff must establish that (i) it owned or had legal possession of the property or entitlement to possession; and (ii) the defendant unlawfully, and without authorization, assumed and exercised dominion and control over the property to the exclusion of, or inconsistent with, the plaintiff's rights. ECF No. 291 at 27.

The Trustees plead that funds transferred to the Movants were property of Juliet, acquired from other investors. ECF No. 291 at 28. The transferred funds were allegedly comingled, and thereby untraceable, and were diverted to various defendants. ECF No. 291 at 28. Millions of dollars were paid out of Juliet to the various defendants while subcontractors and vendors remained unpaid for work actually performed. ECF No. 291 at 28. The Court held in its December 28, 2011 Memorandum Opinion, that these allegations were sufficient to establish a claim for conversion. If the Trustees are able to show that the transfers to the Movants were fraudulent, they may be able to establish that the Estate owned the transferred funds and was entitled to possession of such funds. The Trustees thereby may also be able to show that the Movants unlawfully assumed dominion and control over the funds. Summary judgment is denied.

### Misappropriation/ Unjust Enrichment[3]

Unjust enrichment is defined as the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience. ECF No. 291 at 29. Again, if the Trustees show that the transfers to the Movants were fraudulent, it is cognizable that the Movants enjoyed an unjust retention of a benefit to the loss of the Estate. Summary judgment is denied.

**Preferential Transfers**

Pursuant to 11 U.S.C. § 547(b), a trustee may avoid any transfer made: (1) to or for the benefit of a creditor; (2) on account of an antecedent date; (3) while the debtor was insolvent; (4) on or within ninety days before the petition date, or between ninety days and one year before the petition date if the creditor was an insider at the time of the transfer.

None of the alleged preferential transfers to Mr. Crable occurred within the ninety-day preference period of § 547(b)(4)(A). Three of the transfers occurred within the one-year preference

---

[3] In its December 28, 2011 Opinion, the Court construed the Trustees' "misappropriation or unjust enrichment" theory in paragraph 185 of the Second Amended Complaint as an unjust enrichment cause of action. ECF No. 291 at 29.

period which is applicable to a creditor who was an insider at the time of the transfer. Mr. Crable's summary judgment evidence included a sworn affidavit in which he asserts that his relationship with Juliet was strictly an arms-length business transaction. ECF No. 57-1 at 3. The Trustees provide no evidence to refute this assertion, and, in fact, do not address the § 547 claim in their Response to Mr. Crable's Motion for Summary Judgment. The movant may sustain his burden of proof by showing that little or no evidence supports the non-movants case. *West v. Flores, et al. (In re St. Marie Clinic, PA)*, 2013 WL 5221005, at *5 (Bankr. S.D. Tex. Sep. 17, 2013) (citing *Babitt v. Schwartz (In re Lollipop, Inc.)*, 205 B.R. 682, 687 (Bankr. E.D.N.Y. 1997)). There is no evidence refuting Mr. Crable's affidavit, and summary judgment is therefore granted in favor of Mr. Crable on the Trustees' § 547 preference claim.

**Amounts sought from Mr. Ecklund**

The Trustees seek to recover from Mr. Ecklund, individually, a $50,000.00 transfer to Marquis Capital and a $75,000.00 transfer to Marquis Westcott. The Trustees cannot recover either of these transfers from Mr. Ecklund individually because there is no allegation, nor any evidence that the corporate veil of these entities should be pierced in order to hold Mr. Ecklund individually liable. There is also no evidence that Mr. Ecklund, in his personal capacity, was the recipient of these transfers. Although the Trustees' transfer chart lists the recipient as, "Michael Ecklund (Marquis Capital)," Marquis Capital does not appear to be a party to this litigation. The Trustees have sued Mr. Ecklund, individually, Marquis Capital II, LLC, Marquis Capital Westcott II, LP and William Marsh Resco I, LP—not Marquis Capital. Summary judgment is granted in favor of Mr. Ecklund with respect to these two transfers.

**Movants' Legal Fees and Costs**

The Marquis Defendants and Mr. Crable's request for fees and costs is denied at this time. Under Tex. Bus. & Com. Code § 24.013, a court may award costs and reasonable attorney's fees as are equitable and just. The Movants assert that they should be awarded fees and costs because the

Trustees' claims against them are baseless. This matter must await trial. At this stage, the Court cannot determine that the claims are baseless.

## Conclusion

The Court will enter an Order consistent with this Memorandum Opinion.

SIGNED **October 17, 2013.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE